ROBERT H. MCCARTER, attorney-general,

*v.*

THE LUDLUM STEEL AND SPRING COMPANY.

[Submitted March 14th, 1906. Decided March 29th, 1906.]

1. The use of a steam traction engine and trailers in the streets of a city is not a public nuisance *per se.*

2. On an issue as to whether the use of a traction engine and trailers in the streets of a city constituted a nuisance, owing to danger to the traveling public or injury to the streets, evidence considered, and *held* insufficient to show a nuisance.

3. The court of chancery has power, at the instance of the attorney-general, to inquire and determine whether one using a traction engine and trailers in the streets of a city has so operated the same, or is likely to do so, as to render it unnecessarily injurious either to the highways or to the traveling public, and to restrain its use accordingly.

4. *P. L. 1903 p. 82* requires every person driving a motor vehicle, at request from a person riding or driving a horse, to cause the motor to

stop and remain stationary.—*Held*, that though, on an information by the attorney-general charging defendant with creating a public nuisance consisting of the use of a traction engine and trailers in the streets of a city, there was some evidence tending to show that stopping the engine was injurious to the highway, owing to the slipping of the wheels when the engine started, the defendant would not be restrained from stopping on the proper signal.

5. On an information by the attorney-general seeking to restrain defendant from operating a traction engine and trailers in the streets of a city, defendant should come under obligations to the municipal authorities to repair and keep in repair any part of the street, where it clearly appeared that actual excavation was due to the revolving of the wheels in turning corners.

6. On an information by the attorney-general *to* restrain defendant from operating a traction engine and trailers in the streets of a city, it appearing that one street, *occasionally used*, had *never been so* constructed as to render it fit for heavy travel, the defendant will be enjoined from using such street without the consent of the city.

On final hearing on information and answer and proofs taken in open court.

*Mr. James E. Howell,* for the informant.

*Mr. Francis Scott,* for the defendant.

PITNEY, V. C.

The attorney-general in behalf of the State of New Jersey presents his information against the Ludlum Steel and Spring Company, charging that company with creating a public nuisance in several streets of the borough of Pompton Lakes, in the county of Passaic, and asking that it be enjoined from continuing such nuisance.

The defendant admits doing the acts which it is alleged creates the nuisance, but denies the result, and asserts that no nuisance results from its action.

The nuisance is alleged to consist in the use upon the streets of the borough of a steam locomotive with cars attached to it, and transporting thereon freight to and from its works (located in the southerly part of the borough) and the station of the Susquehanna railway, a distance of about one mile and a quarter.

The allegation is

"that said locomotive sends out smoke from the smokestack, and the general appearance of the train formed by the locomotive and cars attached thereto is that of an ordinary train of freight cars on a steam railroad track, except that they are smaller in size and are operated directly upon and over said streets and highways. Said locomotive and cars thus operated constitute an unlawful obstruction upon said highways, and are a nuisance and an unwarranted use of the highways. The appearance of said train is such that horses of ordinary gentleness have often been frightened by it, and it is liable to frighten such horses.

"By means of such operation of said train as aforesaid, the rights of the public in said highways to use the same for ordinary travel are greatly infringed upon, and the safety of the public is endangered, and the streets and highways upon which the same is operated are injured by means of the heavy pressure to which they are thus subjected and the unusual method of operation of said train. The surface of the streets is torn up and injured by means of such operation.

"Your informant charges that such use of said highway by the said Ludlum Steel and Spring Company is unlawful and unwarranted, and an infringement of the rights of the public in said highway."

The facts developed at the hearing are the following: The defendant's steel works were established over half of a century ago and have been operated more or less steadily during that period. The motive power was, during that time, derived from the fall due to a dam on the Ramapo river, upon which they are situated, and the coal which they used for making heat was delivered to the works by the feeder of the Morris canal.

In 1903 a severe flood washed away the dam, and so far filled up the feeder with solid matter that it became unnavigable, and the defendant was obliged thereafter to obtain its supplies of coal and crude material for the manufacture of steel from one of the railroads which pass about a mile and a quarter away, namely, the New York, Susquehanna and Western railroad, commonly called the Susquehanna, and the New York and Greenwood Lake railroad. The defendant chose the Susquehanna railroad.

The old Paterson and Hamburg turnpike passes near the works, being laid at that point on a course of about northwest and southeast. Somewhere near the centre of the borough and just east of the Wanaque river (the outlet of Greenwood lake) it turns directly west. From that turn the road called Wanaque avenue runs nearly north and east of the Wanaque river to the Susquehanna railroad station, and then turns to the west and

crosses the Wanaque river and connects with the main road running north to Boardville, Greenwood and Ridgewood. A newer street has been laid out commencing in the Hamburg turnpike about a quarter or a third of a mile northwest from the steel works and is laid nearly north and south and parallel with Wanaque avenue to a street called Lakeside avenue, which is laid nearly east and west from Wanaque avenue to and along the side of the lake as it originally existed.

There were thus two routes by which the defendant could reach the Susquehanna railroad station, one by the Hamburg turnpike and Wanaque avenue, the other by the Hamburg turnpike until it reached Ramapo avenue, thence along Ramapo avenue to Lakeside avenue, thence for a short distance along that avenue to the railroad station.

The attorney-general claims that it used, first and last, all of these streets with great injury to each of them, more especially to Ramapo avenue.

These highways have all been recently macadamized or stoned. The general width of the traveled part is and was twenty-four feet, beside the sidewalks. The width of the stone work was sixteen feet, except on Lakeside avenue, where it is a little less, and the depth of the stone work was only four inches. The Hamburg turnpike, and, I believe, the Wanaque road, were old and well-hardened roads, especially the Hamburg, which is and for many years has been a much-frequented thoroughfare, and that part of it here in question had been hardened by the application of forge cinders.

These were both macadamized in 1892 and have been repaired once since.

The Ramapo road or avenue was stoned in 1898, and, I infer from the evidence, had been subjected to but little, if any, previous travel. It is for its whole length, which is about three-quarters of a mile, without any drainage fall except towards the centre of its length, hence the surface water after a rain collects at that point, and there is no sufficient side drainage, so that it must be disposed of by soakage into the gravel and by evaporation.

Preparatory to the application of stone to Ramapo avenue it

was rounded up in the centre and rolled. The bed thus formed consisted wholly of material taken from the sides, which, according to one of the contractors who did the work, had more or less loam in it. It was rolled by a roller weighing only three tons, five feet in width and four feet in diameter, drawn by horses. I conceive this to be entirely insufficient to make a solid road for heavy travel. It was top dressed, after it had been used about two years, with the screenings from broken stone mixed with clay for a binder, that is, to cause the fine screenings to adhere to each other and pack under pressure. It is common knowledge that the result of the free use of clay binder with screenings on a road is to make it muddy after a rain. The pressure of the vehicles causes the clay to rise and separate itself as common mud. In this case I am satisfied from the evidence that too much clay was used.

I have been thus particular in describing this Ramapo avenue, because the principal damage from the defendant's engine and trail of cars is located upon Ramapo avenue.

I come now to the engine and trail of cars. These were installed by the defendant in August, 1904, and the information of the attorney-general was filed on October 24th, 1905. The locomotive or road engine is properly described as looking like an ordinary locomotive engine used on ordinary railways, except that it is much smaller. It has two driving wheels attached immovably to an axle without a crank and driven by a cog gearing from another axle or shaft, which is driven by a small engine placed immediately over the driving wheels and supplied with a fly-wheel. The gearing causes the driving wheels to revolve much slower than the crank shaft, and the fly-wheel assists in starting the engine. The engine carries about seven tons on the driving wheels and one or less on the smaller forward wheels, which are used to guide it. The drivers are eighteen inches wide and five feet six inches in diameter. It will be seen at once that they do, to a certain extent, act as rollers and hardeners of the road. This is a claim made by the defendant which, I think, is thoroughly supported by the evidence and common knowledge. They are eighteen inches greater in diameter than the roller used to pack these roads. A moment's thought leads to the conclusion

that the larger the diameter of the roller the better it will pack, because it tends less to push material under it one way and the other by its weight. In the next place, it has seven or eight tons of pressure as compared with three tons of the roller used in making these roads. On the other hand, each wheel is only eighteen inches wide instead of five feet. The forward and guiding wheels of the engine are three feet in diameter and six inches wide.

The cars drawn by this engine, upon which the freight is carried, are equipped with wheels with tires six inches wide. Here again it is common knowledge that a wagon with a wide tire cuts up or injures a road less, other things being equal, than one with a narrow tire. The tire of an ordinary truck is two or three inches wide. These trailers or cars carry from six to eight tons. And while the proof is that the engine had been, on a few occasions, run with three or four cars attached, yet the clear weight of the evidence is that the regular and ordinary load was and is two cars, and the occasion of adding more cars was exceptional.

The engine and two trailers made a train fifty feet or a little more in length.

Next as to the mode of its use. No complaint was made of the speed—not over four miles per hour—which it attained, and none of the conduct of the engine driver. The proof showed that he always stopped his engine when asked by gesture so to do, and that he kept on one side of the traveled way so that other vehicles could pass.

It was objected that the engine was on some occasions operated after dark, but this again was exceptional, the rule and the usual practice being that its operation was confined within the ordinary laborer's day of ten hours.

The objections to the use of the engine were two—*first,* that it frightens the horses lawfully on the highway, and *second,* that it injures the road.

On both of these points the evidence is quite contradictory.

It was admitted that horses were inclined to shy at it precisely as they would at any other strange object and as they do at automobiles. The exhaust from the engine is muffled so that it makes very little noise. The principal noise is caused by the

cog gearing. The weight of the evidence is that, as usual in such cases, the horses in the neighborhood become accustomed to it and many of them never have shied at it.

The charge of injury to the roads has more substance.

In order to prevent slipping and to cause the wheels to adhere to the surface of the road the drivers are furnished with corrugations five-eighths of an inch high and two inches wide, placed diagonally across the face of the wheel at intervals of seven inches from centre to centre. These corrugations were incorrectly called by the witnesses flanges. They are placed diagonally across the surface of the wheel to prevent thumps as they come to the ground, and the defendant has recently adopted an improvement by changing their form into a letter V, and my own judgment as a juryman is that the change will result in an improvement.

Now as to the injury done to the streets by this machine. It will undoubtedly wear the face of the street precisely as any other vehicle shod with iron will wear it. But it is said that the corrugations have a peculiar effect in that respect in that they make a mark or indentation on the surface of the street, and in so doing grind up the small stone forming the top dressing, and that in order to propel the machine there is a constant pull upon the top dressing and a tendency to disturb it. This also is proven, but not to the extent claimed by the informant, for the photographs show that the appearance of the surface of the street after the engine has passed over it leaves a smooth surface crossed by the indentations due to the corrugations, but not disturbed by them. Some evidence was given to the effect that the machine pressed its way down into the body of the street in such a manner as to loosen the stones at the side and to disturb them just at the edge of the drivers. I think this evidence not entirely reliable, and it is fully met by that of the other witnesses, who swear that the portions of the highway used by this machine present a harder and smoother surface, with less of protruding stones, than the neighboring portions of the same roads.

A careful examination of the evidence leads me to place considerable reliance upon that of Mr. Whitmore, the county engineer employed by the board of freeholders. He made a careful

inspection of the streets in question on January 4th, 1906, at a time when they were in a normal condition, and found no evidence of any injury due to the use of the engine, except at the corner of the streets, where the wheels had ground up the stones in turning.

My conclusion is that when the machine is in actual motion, drawing its load and moving directly along the highway without turning, the result of its operation will not seriously injure the road. It will, on the one hand, tend to pack and solidify it, and, on the other hand, it will not wear it more than an ordinary wagon propelled by horses.

For it must be borne in mind that the iron shoes of a horse, armed as they usually are with corks, do tend very seriously to pick up and loosen the stones of a road. This is common knowledge, and is proven by common observation of the effect on any macadamized or telford road of its use by loaded trucks drawn by horses. It is common knowledge that the portions of such a road used by loaded trucks wear out much more rapidly than portions not so used, and that, other things being equal, the endurance of one of those roads depends upon the extent of its use by horses with metallic shoes armed with corks and drawing heavy loads. The horses are enabled to draw their loads in precisely the same way as is the traction engine. The horses pull by their leverage gained by pressing the corks of their shoes into the macadam and pulling against the material thereof. The traction engine pulls in precisely the same manner against the material of which the road is formed.

But there are one or two instances in the use of the traction engine in which it does seriously injure the road.

One is the starting of it. We all know that when a train of cars, hauled by an ordinary locomotive, is started, the tendency is for the wheels to slip on the track, and so with this traction engine. In order to overcome the momentum of its weight and that of its load, a much heavier pull is required than when it has once started, and the same tendency to slip occurs as in the case of an ordinary locomotive engine in starting a train of cars. The evidence in the cause tends to prove and satisfies me that the defendant's engine here in question has, when it has been

stopped on soft ground, had its drivers to slip and revolve precisely as though it were a locomotive on a slippery track. In fact, there is direct proof that on one occasion it did become stalled at night, perhaps laboring under an unusually heavy load, and did tear up the road under the driver, and in order to enable it to start it was necessary to throw a quantity of small stones in front of the drivers to enable them to lift the engine out of the hole which it had worn in the street.

The evidence tends to show that it is probable that these instances of stalling occurred in the first months of the use of the engine and were the result of incautious overloading. I say this because the party who drove the engine since June, 1905, was sworn and seemed truthful and testified that no such stalling or slipping had occurred since he operated the engine.

Now, the engine driver of this engine, in order to comply with section 6 of the "Act defining motor vehicles" of March 23d, 1903 (*P. L. 1903 p. 82*), was in the habit of stopping his engine when anybody approached it on the street and signaled him to do so, as provided by the act, and I have no doubt that on those occasions the starting of the engine tended to injure the road and probably in some cases did injure it more than it would have done if it had not been stopped. I say this notwithstanding the evidence, as far as it goes, is that ordinarily the machine started immediately without any slip. The same result obtains in the case of the starting of a heavy load drawn by horses. It is common knowledge that horses are liable to paw up the road in starting a heavy load.

The other occasion when the engine is liable to injure the road is when it is turning a corner, and in fact Mr. Whitmore, one of the witnesses of the defendant, gave evidence, as previously stated, that at the point of turning the corner from one of the avenues near the railway station there was evidence that the engine had injured the road. Now this tendency to injure the road when turning the corner is easily understood when we consider that both the driving wheels are firmly fixed to the axle and each one must make precisely the same number of revolutions. At the same time, in going around a circle, the one on the outside of the circle must travel farther than the one on

the inside of the circle, hence the latter of necessity must slip backward while it continues its revolution. The effect of this backward slip is precisely the same as if the engine wheels were revolving without any corresponding forward motion of the vehicle, and inevitably they must tear up and grind the surface of the road. In this respect this engine in question is at a disadvantage in comparison with an ordinary truck whose wheels are loose on the axles.

In the next place, in order to determine whether the engine as used by the defendant is or not a public nuisance in respect of its wear of the road, we must ascertain what the rights of the defendant are in the matter of transporting its material to and from its works and the railway station.

It undoubtedly has a right to use the public highway for that purpose without payment of tolls or tax other than that included in its general tax, which is fifteen per cent. of all the taxes of the borough. But its rights would be precisely the same in that respect if its works were just outside the borough line. In this state we have never adopted the policy of attempting to equalize taxes on vehicles in accordance with the amount of their several users of the highway.

Now, this train of cars will carry about fifteen tons of material at one load of two cars. That, according to common knowledge, would make about eight ordinary two-horse truck loads, so that for every trip made by this engine defendant would be obliged, if deprived of its use, to make eight trips with a two-horse truck, and my judgment as a juryman on the evidence is that the corks of the horses' feet and the wear and tear of the narrow tire of the ordinary trucks in use would do more damage to the roads than the engine in question with its two trailers does with their six-inch tire wheels.

The evidence shows that in twelve months this engine worked on one hundred and thirty-two days out of the three hundred and sixty-five, and that it made four hundred and five trips on those days, being an average of a trifle over three trips a day when it actually ran. If horses and trucks had been used there would have been three thousand or more trips made, or an average of ten trips every day for the three hundred working days in the

year; or if the carting had been confined to the one hundred and thirty-two days there would have been about twenty-three trips each day.

In making this comparison between the two modes of transportation one other matter requires and has not escaped my attention. Taking two tons for an ordinary truck load and the weight of the truck at one ton or less we have less than three tons weight on the four wheels, with, say, two and one-half to three inches for tire width, or ten to twelve inches altogether. Now, the trailers used by the defendant probably weigh three tons (I do not find that their weight is given) and carry seven or eight tons, making ten or eleven tons on four wheels each six inches wide, or twenty-four inches altogether. The result is that by adding together the width of the wheels and comparing them with the weights, the load of the trailers to the square inch is greater than that of the ordinary truck, giving an apparent advantage to the truck. But against this we have, what I conceive to be common knowledge, that the wear of the road is less, from the same weight, to the square inch from a broad wheel than from a narrow wheel; in other words, a tire six inches wide with three tons weight on it will wear the road less than a tire two inches wide with one ton on it. This result is due to the fact that it is the edge of the tire that cuts and wears and not the central part, while the wide tire tends to pack and the narrow tire to separate rather than pack the pieces of stone and to make a rut. In this discussion I have perhaps relied on matters as common knowledge which are not properly so classified, and may have fallen into error, and in order to avoid error will give the parties an opportunity for a rehearing on this part of the case if they desire it.

I come now to the law applicable to this case.

Contrary to my first impressions I find that it has never, so far as the researches of counsel and my own have reached, been held that the use of a steam-engine for purposes of traction on an ordinary roadway was, at common law, per se a nuisance.

It clearly appears that the statutory regulations to which such use is subject in England recognizes the previous use of the highways for the purpose. The first general act is that of August

1st, 1861 (*24 and 25 Vict. Law J. Stat. p. 106*). That act recites that the use of locomotives is likely to become common on turnpikes and other roads, and that under certain local turnpike acts tolls may be levied upon locomotives and other engines drawing or propelling wagons or carriages which are or may be prohibitory of the use of locomotives on the roads, and then proceeds, after further recitals, to regulate the use in various ways and fix the tolls to be charged.

But the thirteenth section provides as follows:

"Nothing in this act contained shall authorize any person to use upon a highway a locomotive engine which shall be so constructed or used as to cause a public or private nuisance, and every such person so using such engine shall, notwithstanding this act, be liable for an indictment or action, as the case may be, for such use where, but for the passing of this act, such indictment or action could be maintained."

This act was followed by other amendatory acts not necessary to be cited, and has been before the courts several times.

The latest case is *Attorney-General* v. *Scott, L. R. 1 K. B. Div. 404 (1904)*. It came before Justice Fillimore on a motion for an injunction. The case was much like this, and on the *ex parte* affidavits the judge granted the injunction. On appeal his action was affirmed, the court contenting itself with simply construing the act. This report is cited by the complainant.

But the case was set down afterwards for hearing and came on with witnesses in open court before Justice Jelf, and was heard July 2d, 1904, as reported in *L. R. 2 K. B. Div. 160 (1905)*. The learned judge, after reciting the evidence, came to the conclusion that the use which the defendant was making of the road in that case did not amount to a nuisance, and his result was affirmed by the court of appeals on the 23d of January, 1905.

The same subject was under consideration by a divisional court composed of three judges of the king's bench, on the 1st of November, 1905, as reported in *L. R. 1 K. B. Div. 167 (1906)*. There the corporation of Chichester recovered damages against the owner of a traction engine for the breaking by it of a water main owned by the corporation, on the ground that the engine was unusually and unnecessarily heavy.

It appears that the question in England in all these cases is whether the use made of the road by the owner of the vehicle is reasonable or not. Thus in *Egerly's Case, in 17th Car.,* reported in *3 Salk. 183,* an information in the king's bench against a common carrier alleged that no wagon ought to carry more than one ton weight and that the defendant used a wagon with four wheels which carried two tons at one time and spoiled the highway leading from Oxford to London, and this information was adjudged good, and though it is said that he went with an unusual number of horses, without setting forth what number, yet the information is good because it was the excessive weight which he carried which made the nuisance.

The American authorities are to the same effect.

In *Moses* v. *P., F. W. and C. Railroad Co., 21 Ill. 516,* the court says: "A street is made for the passage of persons and property and the law cannot define what exclusive means of transportation and passage shall be used. * * * To say that a new mode of passage shall be banished from the streets, no matter how much the general good may require it, simply because the street was not so used in the days of Blackstone, would hardly comport with the advancement and enlightenment of the present age." This language was quoted with approval by Chief-Justice Cooley in *Macomber* v. *Nichols, 34 Mich. 212; 22 Am. Rep. 522.* The action was brought to recover damages to the plaintiff suffered through the alleged wrongful act of the defendant, namely, fright of his horse at a steam traction engine. The court said: "A highway is a public way for the use of the public in general, for passage and traffic, without distinction. The restrictions upon its use are only such as are calculated to secure to the general public the largest practicable benefit from the enjoyment of the easement, and the inconveniences must be submitted to when they are only such as are incident to a reasonable use under impartial regulations. When the highway is not restricted in its dedication to some particular mode of use, it is open to all suitable methods; and it cannot be assumed that these will be the same from age to age, or that new means of making the way useful must be excluded merely because their introduction may tend to the inconvenience or even to the injury

of those who continue to use the road after the same manner as formerly. A highway established for the general benefit of passage and traffic must admit of new methods of use whenever it is found that the general benefit requires them; and if the law should preclude the adaptation of the use to the new methods, it would defeat, in greater or less degree, the purposes for which highways are established.

"In some of the large cities of the country sufficient means of transit by the old methods have become practically out of the question and steam power is permitted as a matter of necessity, not only as a means of moving vehicles by the side of teams in the street, but also over their heads, where the liability to cause fright would perhaps be still greater. Horses of ordinary gentleness would at first be liable to take fright, but after a time they become accustomed to the objects that at first are so fearful to them, just as in the country they become accustomed to see trains of cars passing near them along the ordinary railways, which sometimes for a considerable distance run in immediate proximity to the common roads. Horses may be, and often are, frightened by locomotives in both town and country, but it would be as reasonable to treat the horse as a public nuisance from his tendency to shy and be frightened by unaccustomed objects as to regard the locomotive as a public nuisance from its tendency to frighten the horse. The use of the one may impose upon the manager of the other the obligation of additional care and vigilance beyond what would otherwise be essential, but only the paramount authority of the legislature can give to either the owner of the horse or the owner of the locomotive exclusive privileges. If one, in making use of his own means of locomotion, is injured by the act or omission of the other, the question is not one of superior privilege, but it is a question whether, under all the circumstances, there is negligence imputable to someone, and if so, who should be accountable for it."

In *Commonwealth* v. *Allen, 23 Atl. Rep. 1115; 148 Pa. St. 358 (Supreme Court of Pennsylvania)*, the defendants were indicted and convicted for maintaining a nuisance in a certain road by the use of a road engine with two trailers (much like those here) in hauling stone from a stone quarry over a narrow

piece of road, which in its use for that purpose substantially monopolized the road and endangered the bridges thereon. The court held that the evidence was sufficient to warrant the verdict and affirmed the conviction. There had been an act of the legislature in Pennsylvania regulating the use of traction engines, and the court says: "While a man may have a right under this act of assembly to run a traction engine over a public road for a necessary purpose by complying with the terms of the act, yet if he uses that privilege in an unreasonable and in an unusual way it may constitute a public nuisance. A man may lawfully use a public highway in the transaction of his legitimate business, either for travel or for transportation, but it is common law and common sense that he must use it in a reasonable manner and not interfere with its reasonable use by other citizens. And whether a particular use is an unreasonable use and a nuisance is a question of fact to be submitted to a jury."

Again in the same court, in *Coulter* v. *Township, &c., 30 Atl. Rep. 490 (November 5th, 1894)*, which was an action by an individual against the township for injury due to a broken bridge, in his opinion Judge Mitchell says: "It is an error to suppose that *Commonwealth* v. *Allen* (just cited) decided as a matter of law that the moving of traction engines for steam threshing and other purposes over roads or bridges was at that time an extraordinary or unlawful use of the public highways."

The latest judicial expression to which my attention has been called is found in the case of *Indiana Springs Co.* v. *Brown, 74 N. E. Rep. 615,* in the supreme court of Indiana, June 1st, 1905. That was an action to recover damages against the defendant, plaintiff in error, for driving an automobile in such a manner as to frighten the plaintiff's horse and throw him out to his injury. The court says: "It cannot be said as a matter of law that appellant was guilty of negligence for using an automobile as a means of conveyance on the public highway. * * * In all human activities the law keeps up with improvement and progress brought about by discovery and invention, and, in respect to highways, if the introduction of a new contrivance for transportation purposes, conducted with due

care, is met with inconvenience and even incidental injury to those using ordinary modes, there can be no recovery, provided the contrivance is compatible with the general use and safety of the road. It is, therefore, the adaptation and use, rather than the form or kind of conveyance, that concerns the courts.

"The restrictions which the law imposes upon all modes of travel and traffic on the highways are such as tend to secure to the general public the largest enjoyment of the easement, and must be observed and borne by all alike on the broad ground that all have an equal right to travel in safety; and, when accidents happen as incidents to reasonable use and reasonable care, the law awards no redress." The opinion then quotes the citation from Chief-Justice Cooley, above quoted.

The result of my examination of the subject is that there is no warrant for holding that the use by the defendant of its traction engine and trailers in this case necessarily creates a common-law nuisance such as to warrant the interposition of this court to abate it. Hence it is not necessary to consider the question raised by the defendant that the attorney-general cannot be heard in this court in the present action until the right of the state has been established by conviction or other judgment at law.

That rule applies to the existence of some permanent structure the right to maintain which may be in doubt. I do not think it applies to those cases of nuisance which arise out of the excessive or improper use of a lawful instrument of commerce. I think it would be quite absurd to apply it in this case where the nuisance arises, if at all, from the mode in which the defendant uses its engine.

I am of the opinion that this court has the power, at the instance of the attorney-general, to inquire and determine whether the defendant has in any instance so operated its engine or is likely so to do in the future as to render it unnecessarily injurious, either to the highways or to the traveling public, and to restrain its use accordingly.

I have already indicated wherein and under what circumstances defendant's engine is liable to injure the street, namely, when starting and turning corners. In the matter of stopping

and starting in the street it has, as already stated, been governed by the sixth section of the Automobile act. The defendant conceives it is within the definition of the words "motor vehicle," found in the first section of that act, and has taken out a certificate called an automobile license from the secretary of state. But for that section of the act I should say it was quite unnecessary for the defendant to stop its engine, since its speed never exceeds four miles per hour.

For these reasons I am of the opinion that this court ought not to restrain defendant from stopping its engine on the proper signal.

With regard to the injury to the street and the turning of corners the evidence shows, as I believe, that this only occurs at one point. But wherever it occurs I think the defendant should come under obligations to the proper municipality to repair and keep in repair that part of the street or any other place or part where it shall clearly appear that any actual excavation in the street is due to the revolving of its wheels.

In the next place, I think the defendant should be enjoined from attaching more than two trailers to its engine.

The principal difficulty I have had in this case is as to whether the defendant ought to be enjoined from using Ramapo avenue. For reasons already stated I conclude that this avenue never was so constructed as to render it fit for heavy travel, either by ordinary loaded trucks or by defendant's traction engine, and I think it would have been as much worn by the use of trucks as by defendant's engine. I infer from the evidence and the statements of counsel that the defendant has of late refrained from using it, and I feel disposed to enjoin it from using it unless the municipality shall consent thereto.

With regard to the danger to the traveling public arising from the liability of horses to be frightened by the engine, I think that this court ought not to interfere. No restrictions which it may place upon the use of the engine can materially reduce its liability to frighten horses. The engine differs from the ordinary automobile in the respect that it is substantially stationary and its owner and driver are always to be found and are liable at law to respond in damages for any injury which

may result in that connection. On this subject the authorities leave no room to doubt. The very question is dealt with in some of those which I have cited.

I will advise a decree in accordance with this opinion after hearing counsel.