421 S.E.2d 253

**William B. DUFF and Leda Duff, et al., Plaintiffs Below, Appellees,**

v.

**MORGANTOWN ENERGY ASSOCIATES (M.E.A.), a West Virginia Partnership, et al., and Anker Energy Corporation, Defendants Below, Appellants.**

**No. 20647.**

Supreme Court of Appeals of West Virginia.

Submitted May 6, 1992.

Decided July 20, 1992.

**714**

M. Blane Michael, James R. Snyder, W.T. Shaffer, Jackson & Kelly, Charleston, for appellant, MEA.

John Tinney, Carl L. Fletcher, Jr., Spilman, Thomas, Battle & Klostermeyer, Charleston, for appellant, Anker Energy Corp.

William F. Byrne, Allan N. Karlin, Charles R. DiSalvo, Jeff L. Lewin, Morgantown, for appellees.

Robert Digges, Jr., ATA Litigation Center, Alexandria, Va., amicus brief of West Virginia Motor Truck Ass'n, Inc.

Joanna I. Tabit, Mario J. Palumbo, Office of Atty. Gen., Charleston, amicus brief of West Virginia Public Energy Authority.

Neil A. Reed, Kingwood, amicus brief of Tri-State Coal Operators Ass'n, Inc.

PER CURIAM:

Morgantown Energy Associates, Mid–Atlantic Energy Company, Dominion Cogen, WV, Inc., Hickory Power Corporation (hereinafter collectively "MEA"), and Anker Energy Corporation (Anker) appeal the order of the Circuit Court of Monongahela County which found that the trucking method proposed by MEA to transport materials to and from its cogeneration power plant facility constitutes both a public and private nuisance, and enjoined MEA from delivering fuel and removing residue from the facility by truck.

I.

The controversy from which this nuisance action arises involves the construction and operation of MEA's cogeneration power plant facility in Morgantown, West Virginia. The facility, which cost approximately $174 million, was constructed to produce steam for West Virginia University and electricity for Monongahela Power Company. The facility is designed to produce that steam and electricity from two circulating fluidized bed boilers which will burn coal and waste coal (gob) as fuel. The coal and gob are to be burned with limestone to reduce sulphur dioxide emissions. MEA plans to transport coal, gob, limestone and ash by truck into and out of the power plant facility.[1]

On September 29, 1989, the plaintiffs, William B. Duff and Leda M. Duff, et al., owners of residential and commercial property located near the facility and proposed trucking route, initiated an action against MEA seeking to enjoin, as both a public and a private nuisance, the construction and operation of the facility,[2] and the transportation of coal, gob, limestone and ash by truck into and out of the facility along the streets and routes of Morgantown.

A pre-trial conference was held on July 16, 1990, at which time the plaintiffs acknowledged that the primary issue at trial would be the proposed delivery and removal of materials from the plant by truck. The trial was subsequently conducted, without a jury, beginning on December 3, 1990, and concluded on December 7, 1990.

The trial judge submitted his opinion on June 7, 1991, finding that MEA's proposal to transport coal, gob, limestone and ash by truck to and from the facility constituted a public and a private nuisance, and enjoining MEA from transporting such materials to and from the facility by truck. The trial judge found that transporting those materials by barge on the Monongahela River

---

**1.** MEA proposes approximately 67 round trips per day of heavy trucks hauling material.

**2.** The issues involving the location of the power plant and the emissions from the plant were not · raised by the plaintiffs as cross-assignments of error.

would create no economic, environmental or recreational problem, and that one barge alone would be sufficient to remove all the residue produced in an entire week.[3] The trial judge further found that the evidence did not establish that the emissions from the facility, when operational, will create an unreasonable harm. An order was entered on June 24, 1991, reflecting the court's opinion.

MEA subsequently filed motions for a new trial and to alter or amend the court's order. MEA urged the trial court to alter or amend its order to allow it to use trucks to transport materials over routes in Morgantown which would avoid all but a small segment of Beechurst Avenue. The trial court, recognizing that there was no evidence presented at trial indicating that barging would cause MEA any economic hardship, denied the motions.

Thereafter, MEA petitioned this Court for a stay pending final disposition of the appeal in this case. We granted MEA's motion for a stay on November 13, 1991, and have allowed trucks to transport materials to the power plant facility on an alternate northern route.

The West Virginia Public Energy Authority filed an amicus brief in support of the positions of MEA and Anker. The West Virginia Motor Truck Association, Inc. and the Tri–State Coal Operators Association, Inc. also filed an amicus brief urging this Court to dissolve the injunction issued by the circuit court.[4]

## II.

At issue in this case is whether the circuit court properly enjoined MEA's proposed trucking of materials to and from its power plant facility as both a private and a public nuisance. Before we begin our discussion in this case, we shall briefly summarize the law of private and public nuisance in West Virginia.

Although there is no precise definition of the term "nuisance" befitting every case, this Court has generally described what may constitute a nuisance:

A nuisance is anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable.... A nuisance is anything which interferes with the rights of a citizen, either in person, property, the enjoyment of his property, or his comfort.... A condition is a nuisance when it clearly appears that enjoyment of property is materially lessened, and physical comfort of persons in their homes is materially interfered with thereby.

*Hendricks v. Stalnaker,* 181 W.Va. 31, 33, 380 S.E.2d 198, 200 (1989). *See Sharon Steel Corp. v. City of Fairmont,* 175 W.Va. 479, 483, 334 S.E.2d 616, 621 (1985), *appeal dismissed,* 474 U.S. 1098, 106 S.Ct. 875, 88 L.Ed.2d 912 (1986); *Martin v. Williams,* 141 W.Va. 595, 610–11, 93 S.E.2d 835, 844 (1956). We acknowledged in *Sharon Steel* that "nuisance is a flexible area of the law that is adaptable to a wide variety of factual situations." 175 W.Va. at 483, 334 S.E.2d at 621.

In distinguishing between a private nuisance and a public nuisance, we gave the following definition of a private nuisance in syllabus point 1 of *Hendricks, supra:* "A private nuisance is a substantial and unreasonable interference with the private use and enjoyment of another's land." Further, in *Hendricks,* we described the type of conduct that would constitute a private nuisance as "conduct that is intentional and unreasonable, negligent or reckless, or that results in ... abnormally dangerous conditions or activities in an inappropriate place." 181 W.Va. at 33–34, 380 S.E.2d at 200. We pointed out, relying upon sections 821E and 821F of the *Restatement (Second) of Torts* (1979) that "[r]ecovery for a private nuisance is limited to plaintiffs who have suffered a signifi-

---

**3.** In its findings, the circuit court stated that "[o]ne barge alone will suffice to remove from the facility nearly all the residue produced in an entire week, a total of 900 tons of material, the equivalent of roughly 294 ... truck loads."

**4.** The West Virginia Citizens Action Group also filed an amicus brief on November 1, 1991, in opposition to MEA's petition for appeal.

cant harm to their property rights or privileges caused by the interference." 181 W.Va. at 34, 380 S.E.2d at 201. Finally, we adopted a balancing test in syllabus point 2 of *Hendricks* to assist in determining when an interference is unreasonable: "An interference with the private use and enjoyment of another's land is unreasonable when the gravity of the harm outweighs the social value of the activity alleged to cause the harm."[5]

■ In an earlier case, *Hark v. Mountain Fork Lumber Co.*, 127 W.Va. 586, 595–96, 34 S.E.2d 348, 354 (1945), we distinguished a public nuisance from a private nuisance:

A public nuisance is an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons.[6] The distinction between a public nuisance and a private nuisance is that the former affects the general public, and the latter injures one person or a limited number of persons only. Ordinarily, a suit to abate a public nuisance cannot be maintained by an individual in his private capacity,[7] as it is the duty of the proper public officials to vindicate the rights of the public.

*See Sharon Steel*, 175 W.Va. at 483, 334 S.E.2d at 620. Furthermore, we have consistently reaffirmed, as a general rule, a fair test as to whether a particular use of property, or a business lawful in itself, constitutes a public nuisance:

'As a general rule, a fair test as to whether a particular use of real property constitutes a nuisance is the reasonableness or unreasonableness of the use of the property in relation to the particular locality involved, and ordinarily such a test to determine the existence of a nuisance raises a question of fact.' Syllabus Point 3, *Sticklen v. Kittle*, 168 W.Va. 147, 287 S.E.2d 148 (1981).

Syl. pt. 5, *Sharon Steel, supra. See also Hendricks*, 181 W.Va. at 34, 380 S.E.2d at 201; *Harless v. Workman*, 145 W.Va. 266, 275, 114 S.E.2d 548, 553 (1960).

Although the proposed conduct complained of in the case now before us was found by the circuit court to be both a private and a public nuisance, at the heart of this case is actually the prospective or anticipatory nature of the alleged nuisance. While courts generally grant injunctions to abate existing nuisances, there is also authority for courts to enjoin prospective or anticipatory nuisances. 58 Am.Jur.2d *Nuisances* § 351 (1989); W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 89, at 640–41 (5th ed. 1984); *see generally* Andrew H. Sharp, *An Ounce of Prevention: Rehabilitating the Anticipatory Nuisance Doctrine*, 15 B.C.Envtl.Aff.L.Rev. 627 (1988).

■ This Court discussed the issue of abating a prospective nuisance in *Chambers v. Cramer*, 49 W.Va. 395, 38 S.E. 691 (1901). In that case, Cramer sought to enjoin the operation of a blacksmith's shop located in close proximity to his house and the hotel of which he was the proprietor. In reversing the lower court's award of an injunction, we recognized in syllabus point 2:

It is a general rule that when the thing complained of is not a nuisance *per se*,[8]

---

5. Our adoption of a balancing test to assist in determining the existence of a nuisance has been characterized by one commentator as "revolutionary." Jeff L. Lewin, *The Silent Revolution in West Virginia's Law of Nuisance*, 92 W.Va.L.Rev. 235, 237 (1990).

6. We believe this definition is consistent with the *Restatement (Second) of Torts* § 821B(1) (1979), which defines a public nuisance as "an unreasonable interference with a right common to the general public."

7. Traditionally, a private plaintiff, in order to have standing to bring a public nuisance action, had to show a "special injury" different in both kind and degree from the public. *Hark v. Mountain Fork Lumber Co.*, 127 W.Va. 586, 34 S.E.2d 348 (1945); *Curry v. Boone Timber Co.*, 87 W.Va. 429, 105 S.E. 263 (1920). *But see* Zygmunt J.B. Plater, et al., *Environmental Law and Policy: Nature, Law and Society* 130 (West 1992).

8. Nuisances may be characterized as either a nuisance per se or a nuisance per accidens. A nuisance per se has been generally defined as an act, occupation, or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings. *Harless v. Workman*, 145 W.Va. 266, 274, 114 S.E.2d

but may or may not become so, according to circumstances, and the injury apprehended is eventual or contingent, equity will not interfere; the presumption being that a person entering into a l[e]gitimate business will conduct it in a proper way, so that it will not constitute a nuisance.

We explained that, to warrant injunctive relief as to a prospective nuisance, "the fact that it will be a nuisance if so used must be made clearly to appear, beyond all ground of fair questioning." [9] Syl. pt. 3, in part, *Chambers, supra.*

We further recognized, in *Chambers,* quoting *Hough v. Borough of Doylestown,* 4 Brewst. 333, circumstances under which a prospective nuisance would be enjoined:

[I]n order for equity to enjoin a private nuisance *the danger must be impending and imminent* and *the effect certain, not resting on hypothesis or conjecture, but established by conclusive evidence.* If the injury be doubtful, eventual, or contingent, or if the matter complained of i[s] not *per se* a nuisance, an injunction will not be granted. *In cases of prospective nuisance, a court of equity will not interfere unless the damages to be apprehended will be serious, nor when upon balancing the inconveniences or injuries, greater injury will be inflicted by granting than by refusing an injunction.*[10]

49 W.Va. at 400–01, 38 S.E. at 693 (emphasis added).

This Court, however, pointed out in *Chambers* that if the business proved to be a nuisance to the plaintiff or others in the comfortable enjoyment of their property after it was opened and operated, "they will be entitled to relief therefrom by the abatement of the nuisance and the defendants will be held liable for damages." 49 W.Va. at 405, 38 S.E. at 694. *See also Thacker v. Ashland Oil & Refining Co.,* 129 W.Va. 520, 41 S.E.2d 111 (1946).

### III.

To determine whether the plaintiffs satisfied their burden of establishing that MEA's proposed trucking constitutes a prospective nuisance and warrants abatement, we shall review the evidence presented at trial with respect to both the public and private nuisance aspects of the proposed trucking plan.

#### A. *Private Nuisance*

The plaintiffs, who bear the burden of proof, introduced the testimony of residential and commercial property owners in support of their assertion that the proposed trucking would constitute a private nuisance.[11] Ann Dinardi, a retired pharmacist who resides on Beechurst Avenue, testified that she can hear the "big heavy trucks" that currently travel by her house, and that they cause the windows and the house to shake. She also complained of the traffic

548, 552 (1960); 58 Am.Jur.2d *Nuisances* § 18 (1989); 66 C.J.S. *Nuisances* § 3 (1950). A nuisance per accidens, or in fact, has been generally defined as those which become or may become a nuisance based on the facts, circumstances, and surroundings, and as an activity not by its nature a nuisance, but one which may become a nuisance by reason of the locality, surroundings, or the manner in which it may be conducted or managed. *Harless, supra;* 58 Am. Jur.2d *Nuisances* § 17 (1989); 66 C.J.S. *Nuisances* § 3 (1950).

9. The plaintiff seeking the injunction to abate the prospective nuisance bears the burden of proving that the proposed conduct will constitute a nuisance "beyond all ground of fair questioning." There is no dispute among the parties in this case that older West Virginia cases follow the standard that an activity will be en-

joined prospectively if it is "reasonably certain" that such activity will constitute a nuisance.

10. A good example of a case where the doctrine of anticipatory nuisance was applied to enjoin activity which threatened irreparable injury and potentially devastating harm is *Village of Wilsonville,* 86 Ill.2d 1, 55 Ill.Dec. 499, 426 N.E.2d 824, 838–39 (1981). There, the Supreme Court of Illinois found that a chemical-waste-disposal site, which was located over an abandoned tunnel mine, was a nuisance both presently and prospectively, and enjoined operation of the chemical-waste-disposal site.

11. The plaintiffs also introduced the testimony of Rodney Allen Pyles, the Monongahela County Assessor, who testified that the traffic congestion caused by the additional diesel trucks will have an impact on the value of certain commercial properties.

congestion that already exists on Beechurst Avenue. Ms. Dinardi testified that she joined the lawsuit because she was concerned about the "health situation for the future of the people," and that she was concerned about the fumes from the diesel trucks.

Deborah Ann Rosati, the operator of the Heart 'N' Home Store located on Beechurst Avenue, testified regarding the effects of the dust and traffic congestion resulting from the trucks and the construction of the power plant.[12] Ms. Rosati stated, when asked about the trucks MEA proposes to use to haul its materials to and from the plant, that "I don't think it's going to be a very clean area to have a shop down there, to continue for me to put the hours in I do to clean, ... I think that with all the trucks going in carrying coal, going out carrying the ash, all day long, it's not going to be a very clean area."

Another property owner, William Duff,[13] testified that he can hear the traffic from Beechurst Avenue in his home, and that the loudest traffic noise comes from the trucks.[14] Mr. Duff testified that it is quite common to wait "at least five minutes" to turn left from Eighth Street onto Beechurst Avenue with the current traffic congestion, and that if it is during the late

afternoon "[y]ou might as well forget it" because it's "hard to get out." [15] Mr. Duff also testified that he believes that the installation of a traffic light will cause traffic coming down Monongahela Boulevard to be backed up "clear to the Coliseum." Mr. Duff testified that traffic was already backed up during rush hour. When asked whether having the trucks travel at nighttime would alleviate the congestion, Mr. Duff agreed that it would, but stated that the noise from the trucks would interfere with the residents' sleep. Finally, Mr. Duff testified that placing tarps on the coal trucks will not alleviate the dust problems caused by those trucks.[16]

John B. Brand, a partial owner of Sanders Floor Covering and one of four owners of the Seneca Center,[17] also testified on behalf of the plaintiffs. He testified that there had been an increase in the amount of traffic and dirt in the area after MEA began construction of the plant and the trucks began hauling materials in and out of the plant. Mr. Brand testified that the Seneca Center has five less stores than it had before the construction of the plant was announced.[18] He also testified that Mr. Swartz, from Mid–Atlantic Energy Company, had represented to him and other merchants at the Seneca Center that

---

**12.** David Lee Rosati, Deborah Rosati's husband, also testified with respect to the "dirt and debris" which has resulted from the truck traffic during the construction of the plant. He also testified that he believed there would be an increase in dirt, noise and pollution from the diesel trucks.

**13.** Mr. Duff is also a member of the Citizens Advisory Committee appointed by the city council "to make the plant become a healthy environment for the people of the City of Morgantown." Mr. Duff testified that originally the committee was primarily concerned about the air quality from the plant because Michael Swartz, an employee of Mid–Atlantic Energy Company, and others had represented that MEA intended to use barges to transport materials to and from the plant. However, the concerns now expressed by him relate to the "traffic situation that's going to be enhanced by the trucks," and the "diesel contamination that's going to come about from the trucks[.]"

**14.** Mr. Duff testified that he can hear the truck motors and the truck brakes. He stated that he

turns up the volume on his television set so that he "can drown it out."

**15.** Mr. Duff testified that when you look left at the cars and trucks accelerating down Monongahela Boulevard you see traffic "coming out [of] there forty-five and fifty miles an hour." He also testified that traffic gets backed up if there is one slow driver.

**16.** Mr. Duff stated that "I've followed coal trucks with tarps on them and you can still see the dust coming out from underneath the tarp."

**17.** The Seneca Center, located on Beechurst Avenue directly adjacent to the power plant, was an old glass factory that was renovated into a shopping area. There are several retail stores and a restaurant located in the Seneca Center, including Sanders Floor Covering.

**18.** Mr. Brand acknowledged, when questioned by the circuit court, that there could have been reasons other than the construction of the power plant that caused businesses to leave the Seneca Center.

seventy percent of the materials from the power plant would be barged.

Richard J. Sanders, another owner of Sanders Floor Covering and the Seneca Center, testified that occupancy in the Seneca Center dropped from ninety percent to sixty-eight percent after the announcement of the construction of the power plant. Mr. Sanders also testified that Mr. Swartz represented to him that approximately seventy percent of the materials would be brought in by barge. He testified that he was told by Mr. Swartz that the traffic in the area would subside and that the air quality would be better than in the past.

In the present case, the trucking operations complained of by the plaintiffs are anticipated, and have not yet occurred. The plaintiffs, therefore, had the heavy burden of proving that the proposed trucking of materials to and from the power plant facility constituted a private nuisance "beyond all ground of fair questioning." As we stated previously in this opinion, the plaintiffs had to show, pursuant to our holding in *Hendricks, supra,* that the proposed trucking would constitute "a substantial and unreasonable interference with the private use and enjoyment" of their land and would cause them to suffer "a significant harm to their property rights or privileges." The plaintiffs further had to show that the "gravity of the harm outweighs the social value of the activity alleged to cause the harm."

Clearly, trucking is not a nuisance per se.[19] Furthermore, it does not clearly appear from the record that the proposed trucking either threatens devastating harm or is certain to result in serious damages or irreparable injury. The potential harm or danger from the proposed trucking operations has not been shown to be imminent. Moreover, upon considering the relative economic hardships that will result to the parties should an injunction issue, we cannot conclude, on the basis of the record before us, that the gravity of harm, which is not reasonably certain to occur, outweighs the social utility of the proposed trucking. There was insufficient evidence to support the circuit court's finding that the proposed trucking constituted a private nuisance.[20]

However, at the time this case was tried, MEA's proposed trucking was not in operation. Thus, the record is not developed regarding the actual impact of 67 round trips per day of heavy trucks on the proposed route.[21] Therefore, we point out that our holding today will not deprive the plaintiffs of their opportunity to show that the trucking of materials to and from the plant, once operational, is a nuisance in fact.

### B. *Public Nuisance*

■ During the trial in the present case, with regard to the public nuisance issue, the plaintiffs introduced the testimony of Antoine G. Hobeïka, Ph.D., a professor of civil engineering and the Director of the

---

19. We have recognized circumstances where the haulage of coal by truck could amount to an unreasonable and unlawful use of a roadway. *See West v. National Mines Corp.,* 168 W.Va. 578, 285 S.E.2d 670 (1981), *reh'g on appeal,* 175 W.Va. 543, 336 S.E.2d 190 (1985) (while it is true that the public has a legitimate right to the use and enjoyment of a public roadway, that right must be exercised in a *reasonable* manner and with due regard for the right of adjoining property owners to the use and enjoyment of their property).

20. We recognize that the findings of fact of a trial court are entitled to peculiar weight upon appeal and will not be reversed unless they are plainly wrong. Syl. pt. 2, *Kahlbaugh v. A–1 Auto Parts,* 182 W.Va. 692, 391 S.E.2d 382 (1990); syl. pt. 6, *Mahoney v. Walter,* 157 W.Va. 882, 205 S.E.2d 692 (1974). However, the only finding made by the circuit court with respect to the private nuisance issue in this case was as follows: "The proposal to transport such materials by such trucking method also constitutes a private nuisance to at least some of the plaintiffs in this action and to many of those residents of the local and statewide community whom the plaintiffs represent as a class." The circuit court did not cite any part of the record to support such a finding, nor does evidence clearly appear from the record to support such a finding "beyond all ground of fair questioning."

21. MEA had originally proposed using standard tri-axle trucks to carry 25-ton loads until it was pointed out at trial that this was not permissible. MEA subsequently represented it would use tractor-trailers in order to handle fuel in 25–ton loads.

Center for Transportation Research at Virginia Polytechnic Institute, to quantify the harm caused by the transportation of coal by truck with respect to road damage, traffic congestion and delays, accidents, noise and diesel fumes.

With regard to the damage to the road caused by coal-hauling trucks, Dr. Hobeika explained that there were two types of damages associated with the pavement: (1) the costs associated with rehabilitating the pavement damaged by the trucks, and (2) the increased costs drivers will incur by driving their vehicles over damaged pavement. Dr. Hobeika roughly estimated that the yearly damage to the pavement on Route 119/19 would be $42,096, and that the yearly damage to the pavement on Route 7 would be $3,326.[22] Dr. Hobeika further estimated that the increased operating costs to motorists from driving on damaged roads would be approximately $638,000.

Dr. Hobeika further testified that the traffic on Beechurst Avenue and 119/19 is already "exceeding the capacity." Dr. Hobeika opined that the additional truck traffic on that route and the installation of a traffic light signal at the corner of Beechurst Avenue and Sixth Street will cause traffic congestion, delays for other drivers and increased vehicle costs to other drivers.[23]

Dr. Hobeika also gave an opinion as to the potential for additional accidents on the roads MEA plans to route its trucks. Dr. Hobeika testified that the introduction of additional coal trucks into the traffic stream will increase accidents, and that the installation of the traffic light signal at the corner of Beechurst Avenue and Sixth Street will cause more rear-end collisions.[24] He estimated that there will be seven to eight more traffic accidents per year on MEA's planned truck route, including one at the traffic light signal.

Dr. Hobeika also quantified the increase in noise which will result from additional coal trucks travelling over MEA's proposed route. Dr. Hobeika testified that these additional trucks will cause an increase in noise of 2 to 4 dBA.[25] Dr. Hobeika testified that this increase represents a sixty percent increase in the sound pressure level.

Finally, Dr. Hobeika discussed the effects of the diesel fumes from the additional truck traffic along these routes. Dr. Hobeika testified that "heavy duty trucks" emit more nitrogen oxides as compared to other types of vehicles.[26]

In response to Dr. Hobeika's testimony, MEA introduced the testimony of Warner Reeser, Ph.D. Dr. Reeser calculated the increase in nitrogen oxide from the additional trucks to range from approximately .7% to 3.5%, whereas Dr. Hobeika calculated the range from 13% to 24%. On cross-examination, Dr. Reeser acknowledged that, although he was not an expert on air pollution effects per se, it was generally known that lower levels of nitrogen oxides can be an irritant to the respiratory system.

22. Dr. Hobeika pointed out that these figures were not the actual expenses the highway department would incur. Dr. Hobeika testified that if the department were to resurface the entire street, "that, ... might be two or three times that cost."

23. Dr. Hobeika estimated that the total vehicle costs to other drivers as a result of the traffic light and the increased travel time caused by the additional trucks would be approximately $276,000. Dr. Hobeika further pointed out that the plant employees and the visitors to the plant will also add to the traffic congestion on Beechurst Avenue.

24. Dr. Hobeika testified that "when you install a traffic signal light, especially if it's not warranted—according to the Manual of Uniform Traffic Control Devices, in this case it's not. It's not warranted, the traffic light. If you install it, when the traffic is in one direction, with very little on the other, you're creating rear-end accidents they call it, rear-end collisions. And that's known."

25. The equation used by Dr. Hobeika to calculate the noise is called the Federal Highway Administration Noise Prediction Model.

26. Warner Reeser, Ph.D., an expert witness for MEA, agreed with Dr. Hobeika that "the nitrogen oxides for diesel emissions are much greater than they are for the composite emissions."

MEA also introduced the testimony of Ronald Eck, Ph.D., a professor of civil engineering at West Virginia University. Dr. Eck testified that only a "cursory" analysis of the traffic impact of the additional trucks could be performed using the data relied upon by Dr. Hobeika. Dr. Eck testified that, in his opinion, the MEA trucks will not have a significant impact on the traffic at any time of the day. Dr. Eck suggested that the trucks travel at nighttime for two reasons: (1) the costs the truck drivers and other motorists incur because of the delay time in traffic congestion, and (2) perceived impact.[27] He further testified that he did not believe the increase in capacity and delay as a result of the MEA trucks would be very significant. Dr. Eck stated that the traffic signal light on Sixth Street and Beechurst Avenue will have "some impact," but that this impact cannot be quantified because the timing parameters of the traffic signal light were unknown. He testified that he believed the traffic signal light would reduce right angle accidents.[28] Dr. Eck stated that there was no information available to determine how quickly the road pavement will deteriorate.[29] Dr. Eck further testified that the rehabilitation costs and the road user costs calculated by Dr. Hobeika would not both be incurred in the same year.[30] Finally, he stated that, although he had not examined in depth the accident data from the West Virginia Department of Highways, he did question the number of accidents indicated by Dr. Hobeika.

Howard McGregor, the president of Engineering Dynamics, stated that, based upon the traffic volumes and flow rates he had, he did not calculate the noise level to be as high as Dr. Hobeika.[31] Mr. McGregor admitted on cross-examination that the additional trucks will increase the average noise level. Mr. McGregor explained, upon questioning by the circuit court, that the Environmental Protection Agency's noise standard is 82 dBA at fifty feet, which translates into 90 dBA at fifteen feet. Mr. McGregor testified that "[e]ighty-two dB[A] at fifteen feet is a loud noise level." Mr. McGregor further testified, when asked by the circuit court, that noise caused by shifting gears and the air brakes would not substantially affect the noise dBA.

In this case, because the nuisance of which the plaintiffs complain is prospective, the plaintiffs bear a heavy burden of proving that harm is reasonably certain to result from the proposed trucking. There is a presumption that the proposed trucking will be conducted "in a proper way, so that it will not constitute a nuisance." Syl. pt. 2, *Chambers, supra*. It does not clearly appear from the record that conducting the proposed trucking in this locality will be unreasonable[32] or that it is reasonably certain to cause serious harm, as discussed *supra*. Although the evidence presented indicates that the proposed trucking may constitute a public nuisance once it is operational, the plaintiffs did not meet the burden of showing that such trucking is reasonably certain to create a public nuisance. Therefore, we conclude that there was insufficient evidence to support the circuit court's finding that MEA's proposed trucking constitutes a public nuisance.

### IV.

■ The plaintiffs contend that the evidence shows that barging is a viable alter-

---

27. Dr. Eck explained that "perceived impact" is when "the motoring public, sees a large vehicle on the road, sometimes the impact of that vehicle appears to be more the fact the vehicle is rather large and very conspicuous in the traffic stream."

28. During cross-examination, Dr. Eck testified there had been two right angle accidents at Sixth Street and Beechurst Avenue in the last three years.

29. Dr. Eck acknowledged on cross-examination that coal trucks have an adverse impact on roads. He further stated that he was not asked to perform a study of the impact of the trucks on the pavement.

30. Dr. Eck stated that that would be "double counting."

31. Mr. McGregor testified that a continuous line of trucks would produce approximately 82 dBA.

32. We note that the area through which MEA proposes its trucks to travel is not exclusively residential, and that the proposed route is a truck route.

native to trucking. The post-trial deposition of Ronald E. Morrison, a mechanical engineer, was introduced in support of the barging argument. Mr. Morrison proposed that the ash be fed from a silo located next to a river dock onto the barge.[33] Mr. Morrison stated that the barges would be covered so that "the material is not exposed to any of the elements." Mr. Morrison testified that the ash could be pumped dry from the silo into the barge, and that the technology to pump the ash currently exists.[34] Mr. Morrison testified that the barge can convey approximately 900 tons of material from the plant to the disposal site, where it could be pumped back up into a dry silo and moved by truck. Mr. Morrison stated during cross-examination that he did not perform any financial study on the feasibility of moving the ash by barge.

There is insufficient evidence in the record to support the plaintiffs' contention that barging is a viable alternative to trucking. The record has not been fully developed with respect to the feasibility of Mr. Morrison's plan, nor is there any evidence in the record to indicate costs associated with the barging plan as opposed to the trucking plan.[35] Therefore, we conclude that the circuit court's finding that barging was a viable alternative to trucking was not based on sufficient evidence.

## V.

In awarding an injunction, the trial court must exercise its discretion reasonably and in harmony with well-established principles as we pointed out in syllabus point 4 of *State ex rel. Donley v. Baker,* 112 W.Va. 263, 164 S.E. 154 (1932):

> The granting or refusal of an injunction, whether mandatory or preventive, calls for the exercise of sound judicial discretion in view of all the circumstances of the particular case; regard being had to the nature of the controversy, the object for which the injunction is being sought, and the comparative hardship or convenience to the respective parties involved in the award or denial of the writ.

Based on the record before us, we find that the circuit court abused its discretion in awarding the injunction in this case.

Thus, for the reasons set forth herein, we conclude that the order of the circuit court enjoining MEA from trucking materials to and from its power plant facility is reversed.[36] Our holding in this case does not mean, however, that the plaintiffs are precluded from asserting their rights if the trucking results in a nuisance once it is operational.

Reversed and remanded.

---

**33.** Mr. Morrison explained the ash loading process as follows: "If that silo was located, say, next to or adjacent to a river dock, the material could be conveyed directly to an ash silo adjacent to the river barge. The material could be fed direct from a silo without these unloaders, and loaded just like Portland cement is commonly loaded on river barges."

**34.** Mr. Morrison testified that his former employer, American Electric Power, had used this method. He explained that, when he was plant engineer, they installed three 900–ton silos at their Kanawha River plant and used Fuller–Kenyon pumps. Mr. Morrison testified that "[w]e'd pump into a silo, then we had a pipe running to the river, and we put it direct from the pipes right into cement type covered barges. We probably shipped three or four hundred thousand tons of that over the next few years, dry."

**35.** The plaintiffs assert in their appeal brief that, based on a document provided by MEA near the end of the discovery period, barging would reduce MEA's rate of return on the project from 20% to 16%. The plaintiffs contend that the 4% reduction in MEA's rate of return would not cause "undue hardship."

**36.** We note that, because we are reversing the circuit court's order, we decline to address the other assignments of error.