No. 24-166, *City of Huntington, West Virginia, and Cabell County Commission v. AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation.*

**FILED**

**May 12, 2025**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Walker, Justice, concurring:

I write separately to emphasize that this Court's power to answer questions certified by our esteemed colleagues in the federal courts[1] is not declined lightly here. I cherish this Court's role as the "final arbiter"[2] of West Virginia law and gratefully acknowledge the respectful deference inherent in a certified question. But our power is not without limit, and here it is necessary to exercise restraint. In short, we do not have the integral facts before us to guide a reasoned analysis, placing us in the precarious position of venturing a guess as to what the facts might ultimately be to then reach a conclusion that, as a matter of law, public nuisance does or does not extend to them. I not only concur in the majority's declination to answer the certified question but also see no other option at this stage of the proceeding.

### A.    District Court Proceedings

By the time the lawsuit filed by the City of Huntington and the Cabell County Commission against AmerisourceBergen Drug Corp., Cardinal Health, Inc., and McKesson Corp. (collectively, "Distributors") was tried in federal district court, Plaintiffs'

---

[1] *See* W. Va. Code § 51-1A-3.

[2] *United States v. Taylor*, 596 U.S. 845, 859 (2022).

1

claims had been narrowed to one: a public nuisance claim predicated on the theory that the Distributors "'created, perpetuated, and maintained' the opioid epidemic by repeatedly shipping to pharmacies orders of opioids in quantities that the distributors 'knew or should have known exceed[ed] any legitimate market' for the drugs," which resulted in a public nuisance that was subject to abatement.[3] The evidence at trial showed that "there is and has been an opioid epidemic in" Plaintiffs' communities,[4] involving, among other things, a high opioid overdose rate, "the highest incidence of Neonatal Abstinence Syndrome in the country," increased child foster care placement, increased infectious disease rates, increased crime rates, and decreased property values.[5] But the United States District Court for the Southern District of West Virginia concluded as a matter of law that the Distributors were not liable under a public nuisance theory for creating this epidemic.[6]

In entering judgment for the Distributors, the Southern District first observed that this Court has yet to rule "on the issue of whether the state's law of public nuisance affords a remedy in cases such as this,"[7] and it predicted that "if confronted with the option to extend the law of public nuisance to the sale, distribution, and manufacture of opioids,

---

[3] *City of Huntington, W. Va. v. AmerisourceBergen Drug Corp.*, 96 F.4th 642, 644 (4th Cir. 2024).

[4] *City of Huntington, W. Va. v. AmerisourceBergen Drug Corp.*, 609 F.Supp.3d 408, 419 (S.D. W. Va. 2022).

[5] *Id.* at 420-21.

[6] *See id.* at 484.

[7] *Id.* at 472.

2

the Supreme Court of Appeals of West Virginia would decline with good reason to do so."[8]

But then, the Southern District analyzed the evidence presented during the ten-week trial

and addressed the Plaintiffs' public nuisance claim as though this Court *would* recognize

the claim under the circumstances before the Southern District. Then, the court concluded

that the Plaintiffs, simply put, had not proved their claim.

The Southern District's analysis started with the premise that, "[t]o establish

a public nuisance, a plaintiff must prove 'an unreasonable interference with a right common

to the general public.'"[9] In reaching its conclusion that the Plaintiffs failed to prove that

the Distributors unreasonably interfered with a public right, the Southern District described

the "closed system" for controlled substances established by the Controlled Substances

Act[10] and the Distributors' obligations under the CSA and its implementing regulations to

"guard against theft and diversion of controlled substances" and to "design and operate a

system" for detecting suspicious orders of controlled substances.[11] The Distributors met

these obligations, the Southern District found, and the Plaintiffs did not prove that the

Distributors otherwise "failed to maintain effective controls against diversion" or that

---

[8] *Id.* at 475.

[9] *Id.* at 475 (quoting *Duff v. Morgantown Energy Assocs.*, 187 W. Va. 712, 716 n.6, 421 S.E.2d 253, 257 n.6 (1992)).

[10] *See* 21 U.S.C. §§ 801-904.

[11] 609 F.Supp.3d at 421-22 (quoting 21 C.F.R. §§ 1301.71(a) & 1301.74(b)).

Distributors' "due diligence with respect to suspicious orders was inadequate."[12]  The Southern District also found that the Plaintiffs did not prove that the volume of opioids distributed in their communities was due to "unreasonable conduct" on the Distributors' part.[13]  So, the Southern District concluded, "the distribution of medicine to support the legitimate medical needs of patients as determined by doctors exercising their medical judgment in good faith cannot be deemed an unreasonable interference with a right common to the general public."[14]

As to causation, the Southern District concluded that "[n]o culpable acts by [the Distributors] caused an oversupply of opioids in [Plaintiffs' communities]."[15]  Rather, doctors exercising independent medical judgment prescribed opioids, and the Distributors shipped them to licensed pharmacies to meet the demand created by those prescriptions.[16]  The Southern District also found no evidence of diversion while opioids were in the Distributors' custody or control.[17]  And, the Southern District concluded that the harms Plaintiffs claimed that the Distributors caused were too remote due to intervening causes

---

[12] *Id.* at 425, 438.

[13] *Id.* at 449.

[14] *Id.* at 475.

[15] *Id.* at 476.

[16] *Id.*

[17] *Id.* at 479.

4

like overprescribing doctors, pharmacies that dispense the excessive prescriptions, and diversion created by illegal usage.[18]

### B. Court of Appeals Proceedings and Certification Order

After the Southern District entered judgment in favor of the Distributors, the Plaintiffs appealed to the United States Court of Appeals for the Fourth Circuit. The Plaintiffs contest the Southern District's determination that West Virginia public nuisance law does not extend to the distribution and sale of opioids, and they also challenge the findings and conclusions made in assessing the Plaintiffs' evidence. The Distributors, on the other hand, argue that the Southern District correctly resolved the factual issues before it and correctly found that public nuisance law does not extend to the distribution of lawful products.

After briefing and argument before the Fourth Circuit, the Fourth Circuit made no determination on the Southern District's findings and conclusions. Instead, the Fourth Circuit certified to this Court the following question:

> Under West Virginia's common law, can conditions caused by the distribution of a controlled substance constitute a public nuisance and, if so, what are the elements of such a public nuisance claim?[19]

---

[18] *Id.* at 481-82.

[19] *Cert. Order*, 96 F.4th at 644.

5

In its certification order, the Fourth Circuit recounted the procedural history of this case and the Southern District's prediction that this Court would "decline to extend West Virginia's common law of public nuisance to the sale, distribution, and manufacture of opioids."[20] The Fourth Circuit summarized the closed system within which the Distributors distribute controlled substances and the "public health crisis" Plaintiffs' communities are facing despite controls contained in the CSA.[21] It also briefly described public nuisance law developed by this Court, reciting that "a public nuisance is 'an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons'"[22] and citing footnote 6 of *Duff v. Morgantown Energy Associates*, where we said that "this definition is consistent with the *Restatement (Second) of Torts* § 821B(1) (1979), which defines a public nuisance as 'an unreasonable interference with a right common to the general public.'"[23] The Fourth Circuit then recounted the Plaintiffs' arguments and the Distributors' counterarguments regarding whether the conditions caused by the distribution of a controlled substance can constitute a public nuisance.[24]

---

[20] *Id.* at 644-45.

[21] *Id.* at 646-47.

[22] *Id.* at 648 (quoting *State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 200 W. Va. 221, 241, 488 S.E.2d 901, 921 (1997)).

[23] *Id.* (quoting *Duff*, 187 W. Va. at 716 n.6, 421 S.E.2d at 257 n.6).

[24] *See id.* at 648-49.

6

But as to the facts regarding the reasonableness of any interference with a public right and proximate cause—facts the Southern District found relevant in analyzing the Plaintiffs' public nuisance claim—the Fourth Circuit offered no discussion. Instead, the Fourth Circuit noted, by way of footnote, that "we need address the district court's alleged errors on reasonableness and causation only if the Supreme Court of Appeals recognizes public nuisance as a cognizable claim in this case."[25] It deemed the findings on reasonableness and causation "not 'relevant to the [certified] question[s].'"[26] In another footnote, the Fourth Circuit declined to "expand on" arguments related to whether the Distributors complied with their obligations under the CSA, even though findings that the Distributors complied with the CSA went hand in hand with the Southern District conclusion on the reasonableness of the Distributors' conduct.[27]

So pending appellate review, the factual conclusions of the Southern District stand. These include that the Distributors complied with duties imposed by the CSA and/or otherwise did not fail to control against diversion, engaged in no unreasonable conduct, did not interfere with a public right, and engaged in no conduct that was a cause of the harms identified by the Plaintiffs. And the certification order contains no facts identifying the conduct the Distributors engaged in (or whether that conduct was compliant with the CSA),

---

[25] *Id.* at 645 n.3.

[26] *Id.* (quoting W. Va. Code § 51-1A-6(a)(2)).

[27] *Id.* at 646 n.4.

the public right(s) purportedly interfered with, or any causal links between conduct and harm. We know only that Distributors distributed opioids in a closed system and that an opioid epidemic exists in the Plaintiffs' communities. It is against this backdrop that we are asked whether "conditions caused by the distribution of a controlled substance [can] constitute a public nuisance."

As the Southern District and Fourth Circuit correctly recognized, this Court has yet to consider the applicability of the public nuisance doctrine to the opioid epidemic. Addressing public nuisances in other contexts, we have said that "[a] public nuisance is an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons."[28] Stated another way, it is "an unreasonable interference with a right common to the general public."[29] We have also said that the question of whether a nuisance exists is generally one of fact,[30] and it "is one of degree."[31] Because of the factual nature of the

---

[28] *Hark v. Mountain Fork Lumber Co.*, 127 W. Va. 586, 595-96, 34 S.E.2d 348, 354 (1945).

[29] *Duff*, 187 W. Va. at 716 n.6, 421 S.E.2d at 257 n.6 (quoting Restatement (Second) of Torts § 821B(1) (Am. L. Inst. 1979)).

[30] *See, e.g.*, *Martin v. Williams*, 141 W. Va. 595, 612, 93 S.E.2d 835, 845 (1956) (noting that the question of whether a nuisance exists depends upon the facts adduced); Syl. Pt. 5, *Sharon Steel Corp. v. City of Fairmont*, 175 W. Va. 479, 334 S.E.2d 616 (1985) (holding that determining whether a nuisance exists "raises a question of fact").

[31] *Harless v. Workman*, 145 W. Va. 266, 275, 114 S.E.2d 548, 553 (1960) (observing that whether a nuisance exists "is one of degree, and usually turns on a question of fact").

question, any analysis about whether a given scenario could constitute a public nuisance *as a matter of law* must be anchored by settled, relevant facts.[32]

To illustrate, even though the Supreme Court of Oklahoma held broadly that "Oklahoma public nuisance law does not extend to the manufacturing, marketing, and selling of prescription opioids,"[33] its holding was informed by a developed factual record. In that case, the State sued an opioid manufacturer, alleging that it "failed to warn of the dangers associated with opioid abuse and addiction in promoting and marketing its opioid products" and that this conduct constituted a public nuisance.[34] The Oklahoma trial court entered judgment in the State's favor,[35] and the manufacturer appealed, bringing before the Supreme Court of Oklahoma "for review . . . a compilation of both findings of fact and conclusions of law."[36] The Supreme Court of Oklahoma reversed.[37]

---

[32] *See* W. Va. Code § 51-1A-3 (1996) ("The Supreme Court of Appeals of West Virginia may answer a question of law certified to it . . . ."); *id.* § 51-1A-6 (1996) (requiring a certification order to contain "[t]he question of law to be answered" and "[t]he facts relevant to the question").

[33] *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 721 (Okla. 2021).

[34] *Id.* at 721-22, 725.

[35] *Id.* at 722.

[36] *Id.* at 723.

[37] *Id.* at 731.

In determining that Oklahoma's public nuisance law did not extend to an opioid manufacturer's manufacturing, marketing, and selling of prescription opioids, the court found, first, that the State failed to show a violation of public right; instead, the damages the State sought were "more in line with a private tort action for individual injuries sustained from use of a lawful product and in providing medical treatment or preventative treatment to certain, though numerous, individuals."[38] The court found no "public right to be free from the threat that others may misuse or abuse prescription opioids."[39] The second factor considered by the court in reaching its holding was that the manufacturer "did not control the instrumentality alleged to constitute the nuisance at the time it occurred."[40] In particular, irrespective of any warnings the manufacturer gave, it could not control how the product was distributed, laws governing distribution by pharmacies, how doctors prescribed the products, how pharmacies dispensed them, or how individuals used or responded to the products.[41] And third, the court found that "the district court held [the opioid manufacturer] responsible for products that entered the stream of commerce more than 20 years ago, shifting the wrong from the manufacturing, marketing, or selling of a product to its continuing presence in the marketplace."[42]

---

[38] *Id.* at 726-27.

[39] *Id.* at 727.

[40] *Id.* at 727-28.

[41] *Id.* at 728-29.

[42] *Id.* at 729.

10

So, in determining that an opioid manufacturer's conduct in marketing and selling its products could not constitute a public nuisance under Oklahoma law, the Supreme Court of Oklahoma had before it facts concerning the conduct engaged in by the manufacturer that allegedly created the public nuisance; identification of the public rights allegedly violated; and facts bearing on causation, such as the manufacturer's control (or lack thereof) over its opioids at the time the nuisance was created and the fact that the harm occurred not at the point of manufacturing, marketing, or selling, but twenty years after the product entered the stream of commerce. In short, in addressing the extent of Oklahoma's public nuisance law, the court knew what it was (or, more precisely, was not) extending the law to cover, and it had the facts before it to issue a well-supported decision explaining just how the conduct, public rights allegedly implicated, and causal chain were beyond acceptable limits of public nuisance liability.

Here, conversely (and setting aside that the Plaintiffs did not prove their case during trial and the consequent potential for issuing an advisory opinion based on facts that are now merely abstract and theoretical), the certification order provides only that there is an opioid epidemic in the Plaintiffs' communities and that the Distributors distributed opioids to those communities within a closed system. Far from irrelevant, the facts *essential* to meaningful consideration of whether something constitutes a public nuisance as a matter of law include identification of the specific conduct the Distributors engaged in (or failed to engage in), the public rights allegedly violated, and the causal link alleged to exist between the conduct and the harms. These are the facts considered by the Southern

11

District in concluding that the Plaintiffs failed to prove that the Distributors caused a public nuisance, and they are the facts considered by the Supreme Court of Oklahoma in determining that Oklahoma's public nuisance law did not extend to the manufacturing, marketing, and selling of prescription opioids. Because the existence of a nuisance is a matter of degree, we cannot know whether West Virginia public nuisance law extends to something without knowing what we are being asked to extend it to.

The Maine Supreme Judicial Court, in a similar case, offered observations relevant here about the need for a resolution of all material facts before adjudicating a certified question:

> As we construe the [certification] statute, it contemplates that our response *will be* "determinative of the cause"—and in fact if this were not so the statute would not satisfy constitutional requirements [of a justiciable controversy] as we have already indicated. We cannot see that this can ever be so if the facts remain unresolved and in a hypothetical state. . . . If we are to participate and yet not render purely advisory opinions, we think it will be incumbent upon us to respond to questions only when it is apparent from the certification itself that all material facts have been either agreed upon or found by the court and that the case is in such posture in all respects that our decision as to the applicable Maine law will in truth and in fact be "determinative of the cause" as the statute conferring jurisdiction upon us requires. Such is not the case here.[43]

---

[43] *In re Richards*, 223 A.2d 827, 833 (Me. 1966).

12

The Maine court declined to answer the certified question. For these same reasons, I concur in the majority's decision.