PER CURIAM.
On June 12, 2003, Reuben D. Hall and 45 other residential real-property owners in Elmore County (hereinafter collectively referred to as “the local residents”) sued North Montgomery Materials, LLC (“the mining company”), and Andrea Wood Kat-sarsky, requesting the Elmore Circuit Court to declare the mining company’s proposed granite quarry a public and/or private nuisance and to enjoin the mining company from operating the quarry. On July 24, 2003, the mining company moved to dismiss the complaint. The circuit court denied that motion, after which the mining company answered the complaint and the parties engaged in discovery.
On June 2, 2005, the State of Alabama[1] filed a complaint against the mining company in a case numbered CV-05-254, requesting the circuit court to declare the proposed quarry a public nuisance and to enjoin its operation. On motion of the local residents, the circuit court consolidated the State’s action with the instant case. It is apparent that the cases were consolidated for the purpose of trial only and that each case retained its separate identity. See Rule 42(a), Ala. R. Civ. P. The cases were jointly tried on December 14-15, 2006. From a judgment in favor of the mining company, the local residents appealed to the Alabama Supreme Court. This case was transferred to this court by the supreme court, pursuant to § 12-2-7(6), Ala.Code 1975.
*164 The evidence established that the mining company owns 80 acres and leases from Andrea Wood Katsarsky the mineral rights to an additional 140 acres of land at the intersection of county road 428, known as Providence Road, and county road 462, known as Jackson Trace Road, in Elmore County. The mining company plans to conduct a granite-mining operation on the site.
The site of the proposed mining operation is not visible from the road. It is situated “down in a hollow” at the lowest point on the mining company’s property, surrounded by a 50-foot no-mining buffer. The site is located in an unzoned, rural area of north Elmore County known as the Buyck community. There are no other businesses in the area. The area is primarily residential, with 48 dwellings, a church, and a cemetery within a mile of the site. The nearest school is 16 miles away; the nearest convenience store/gasoline station is 2 or 3 miles away. Most of the local residents are retired; many are people whose families have lived in the area for generations.
The evidence established that the mining company proposes to produce 450,000 tons of gravel per year from its mining operation and that, once production begins, the mining operation will have 100 to 120 trucks, each 8½ feet wide and weighing 88,000 pounds fully loaded, being driven by independent haulers traveling into and out of the quarry site every day. The local residents testified that they believed the operation of the quarry would destroy the peace, tranquillity, and unspoiled nature of the area. They objected to the air pollution, water pollution, noise, heavy-truck traffic, and deterioration of the local roads that, they claimed, would inevitably occur when the mining operation commenced.
The mining site is located several miles from U.S. Highway 231. The site may be accessed from Highway 231 via three routes. The first route involves exiting Highway 231 onto county road 429, known as Buyck Road, driving northwest approximately five miles, then turning east onto Providence Road for about half a mile to the point where the entrance of the quarry lies. The second route travels from Highway 231 northwest onto Buyck Road, turns north onto Jackson Trace Road, and then west onto Providence Road, a total distance of about three and one-half miles. The third route travels almost due west from Highway 231 on Providence Road for about four and one-half miles. A vehicle traveling on Highway 231 north from Montgomery, the nearest large city, would encounter the Buyck Road exit first and then the Providence Road exit a few minutes later.
All three county roads are referred to as farm-to-market roads. They were not designed for heavy-vehicle use. In the 1930s and 1940s these roads were composed entirely of dirt. In the 1950s or 1960s, the county paved the roads using unknown base materials. The paved driving portions of the roads are at all points 21 feet wide or less and at some points, including the entrance to the quarry, are only 17 feet wide. Providence Road and Jackson Trace Road, which have not been substantially improved since they were first paved, have little to no shoulders. The pertinent portions of Buyck Road were resurfaced in 2004 or 2005, and the shoulders of that road were widened to meet Department of Transportation specifications for county roads. Providence Road has a posted weight limit of 25 tons; the other roads do not have any posted weight limit.
The roads are used primarily by the local residents to access their homes, but they are also traveled by residents of Coo-sa County heading to and from Highway 231 and are sometimes used by bicyclists. *165 In addition, school buses and a garbage truck regularly use the roads. Occasionally, but not often, logging trucks and gas trucks travel the roads. When the county improved Buyck Road, its asphalt trucks used Jackson Trace Road, which rutted and damaged the road. Although the county patched the road afterwards, the garbage truck servicing the area has undone some of the patch work. The local residents who testified at trial all agreed that the current conditions of the roads, though poor in places, adequately meet their driving needs.
Reuben Hall testified that he had lived in the area for the first 28 and the last 18 years of his life. He explained that, in the interim, he had worked for a Mississippi chemical company and had owned a fertilizer business. He testified without objection that he was familiar with the type of trucks — tri-axle, semi-trailer, open dump trucks — and the common practices of the independent haulers who drive the trucks that would be used in the mining company’s quarry operations because, he said, they are the same as in the fertilizer industry. Hall stated that the truckers typically haul a minimum of three loads.per day. He testified, without objection, that these trucks would line up near the entrance to the quarry site each morning to pick up their first loads well before the quarry opened, blocking one lane of traffic at and near the intersection of Providence Road and Jackson Trace Road. Hall calculated that, in order for the mining company to meet its projected goal of producing 450,000 tons of granite per year, on an average 8-hour workday 60 trucks would enter and leave the quarry along the roads, a rate of about 1 every 5 minutes.[2]
Hall stated that the trucks are equipped with a compression braking system, or what are called “jake brakes,” that, he said, sound like a machine gun. He predicted that the noise of the trucks would awaken everyone in the area in the predawn hours. He testified that tri-axle dump trucks are harder on paved roads than standard, semi-trailer trucks because their load center is “right over the three axles.”.
Hall identified a number of photographs that were adinitted into evidence. The photographs depict the condition of Providence Road, Jackson Trace Road, and Buyck Road. Some of the photographs show the narrow or nonexistent shoulders on those roads; some illustrate drop-offs or embankments beyond the paved surface of the roads; some depict little or no clearance between two tri-axle dump trucks meeting each other side-by-side on various sections of the roads.
David Bufkin, the county engineer for Autauga County, testified that Providence Road and Jackson Trace Road are not wide enough to handle 2 gravel trucks, each 8½ feet wide, meeting on a road that is only 18 feet wide. Bufkin testified that Providence Road would deteriorate under the expected heavy use if it were not rehabilitated. He- stated that the resurfacing of Buyck Road did not strengthen the base of the road, so it was also susceptible to similar damage. Bufkin testified that the continuing use of the roads by the trucks would first cause potholes- and then, he said, the roads would eventually degenerate into dirt roads. He gave his opinion that the number of trucks that would travel the county roads every day as a consequence of the mining operation greatly *166 increased the chance of accidents and presented a danger to the motoring public.
Richie Byard, the county engineer for Elmore County, testified that Providence Road has no shoulders in many places where there are embankments or drop-offs beyond the paved edge. Byard acknowledged that substantial heavy-truck traffic would cause both Providence Road and Jackson Trace Road to deteriorate quickly. He testified, however, that it was feasible to reclaim Providence Road in order to make it suitable for 120 heavy trucks per day. He explained that when the Alabama Department of Environmental Management (“ADEM”) issued the permit to the mining company, the Elmore County Commission had “tr[ied] to be proactive to address the condition of the roads” before the quarry opened for business. He said that, at the request of the county commission, he had developed a plan to upgrade Providence Road. Byard stated that the mining company had approached the county commission with an offer to provide free material for widening the shoulders of Providence Road and had indicated that, if the county could obtain any grant funds for road maintenance, it would be willing to pay the matching funds on the grant. Byard testified that Providence Road, as a farm-to-market road, was not eligible for federal grants but that the county did apply for a grant from the state’s Industrial Access Road and Bridge Corporation, see § 23-6-1 et seq., Ala.Code 1975, which would not require matching funds.
Byard identified an application that he had submitted on behalf of the county commission to the corporation board, setting out a plan to widen Providence Road to 24 feet, to widen the shoulders to 3 feet, to reclaim and reconstruct the base of the road, and to “repave the road with a buildup that would have a better chance of standing up to [the] truck traffic.” Byard testified that several of the local residents and a local senator had attended the hearing on the grant application and had objected to it. The board of directors of the corporation denied the application. No one testified as to the reason the application was denied, but Hall testified that he doubted that the denial was based on the objection of the local residents. Due to the rejection of the grant application, the county did not have the funds to reclaim Providence Road. According to Byard and Bufkin, if the application had been approved and the plan had been implemented, Providence Road would have been sufficiently rehabilitated to handle the expected truck traffic.[3]
Patsy Cardwell testified that she drives an eight-foot-wide school bus on the roads every weekday, carrying special-education students.[4] During her morning route, Cardwell normally encounters no other traffic except two other school buses. Because she expects to meet these school buses, she is prepared to pass them without incident; however, Cardwell testified that if she were to encounter an oversized vehicle she would have to slow or stop and move part of her bus off the paved road. Cardwell testified that this maneuver would pose a tipping hazard because of the shoulder conditions along the roads. Jim Gwin, a local landowner, testified that he believed emergency vehicles would also en *167 counter difficulty along the. roads when meeting the quarry trucks.
Winifred Harris, a retired Huntingdon College English professor, testified that she grew up in the area, lived in Montgomery during her working life, and inherited from her father 72 acres on Jackson Trace Road, directly across from the mining site. She testified that she was familiar with the history of the Buyck community, a place she described as “quiet and beautiful.” The area was settled in the 1830s and remained a thriving farming community until after World War II. Now, she said, the community is primarily residential, with some recreational second homes used for hunting and fishing. She testified that her property was currently valued at $400,000 to $500,000, but she estimated that, if the quarry were allowed to operate, the value of her property would drop to $100,000 to $120,000. She gave her opinion that the quarry would degrade the lifestyle of the community by causing noise, truck traffic, water pollution to Weo-ka Creek, and air pollution in the form of fine silica dust. She admitted that she had taken an active role in opposing the industrial-access grant to improve Providence Road because, she said, “as a member of this community and as a taxpayer [she] felt there were many more roads that-needed improving and .. [she] felt that if the grant was awarded, [she] ... would be subsidizing an industry that was going to destroy [her] way of life, [her] community”
Two witnesses testified for the mining company — Bradford O’Dell, a co-owner of the mining company, and Larry Speaks, an engineer who had contracted with the mining company to design the layout of the mining operation and to apply for the necessary permit from ADEM. In order to obtain the permit, the mining company had been required to submit information concerning, among other things, its plan for controlling water runoff and particulate discharge. O’Dell stated that the permit had been issued in 2003 and that at the time of trial in 2006 all the necessary plant equipment — a ramp, a hopper, a feeder, a jaw crusher, two conveyors, a shaker screen, a stacker and a crusher — was in place and two test blasts had been conducted. With the exception of some electrical work yet to be completed, the mining company was ready to begin operations. He stated that at the time of trial he and his co-owner had invested approximately $900,000 in preparing for the mining operation.
O’Dell testified that the mining company early on identified the inadequate roads as a problem. The mining company therefore contacted the Elmore County Commission, the governmental entity primarily responsible for the county roads, to determine if Providence Road could be “set up” to be the “main route” for the haulers. At that time, the mining company agreed to donate material to widen the shoulders of Providence Road and to match any funds the county received from grants to improve the road.
In response to the following question on cross-examination by the district attorney: “Do you agree that the roads as they currently exist will be insufficient for transporting the slag on a daily basis,” O’Dell testified: “[N]o, sir, they are not acceptable.” When the district attorney asked O’Dell if he knew what it would cost to “resurface or bring those roads up to specifications] so that they could safely manage the traffic that would result [from the operation of the quarry],” the following occurred:
“MR. BAILEY [counsel for the mining company]: I object. The evidence is in the record that this county engineer prepared those documents, prepared that *168 application, .and these plaintiffs opposed it. They opposed it. For them to come into court and take the position that that is a reason to stop a project because they didn’t want a road widened so it would hurt the project is disingenuous at best. And it is — they have unclean hands to make that argument.
“MR. HOUSTON: The State of Alabama never opposed anything.”
Larry Speaks explained that the mining company’s particulate-discharge plan called for the installation of sprinkler systems at four or five locations — every site from which dirt and dust could escape — in order to control dust incident to the rock-crushing operation. With respect to the plan for controlling water runoff, Speaks said that the mining company had designated five permitted discharge points, each with a sedimentation pond that allowed the sediment to settle before any water left the site. He explained that the permit required the mining company to send a sample of the water discharge to a laboratory every two weeks in order to monitor the pH and total suspended soluble count of the water. Speaks said that ADEM would receive the laboratory test results on a quarterly basis but that it had the authority to inspect the site at any time. He said, however, that the mining company could not wait three months to address a permit violation; if a test sample were in violation of the permit terms, the mining company would have to address the violation immediately.'
Speaks testified that, in addition to information concerning air-quality and water-quality plans, ADEM had required the mining company to address other issues in its permit application. Specifically, Speaks said that in order to address the other issues, the mining company had contacted the following entities: the Army Corps of Engineers, which sent a representative to the site to assess issues with respect to protected wetlands; the United States Fish and Wildlife Service, which determined that the mining operation would not affect any endangered animal species; a botanist from Auburn University Montgomery, who found no endangered plant life; and the Alabama Historical Commission, which decided that the mining operation would not disturb any known historical artifacts. Finally, Speaks testified that he had developed a reclamation plan for the quarry site and submitted the plan to the Alabama Department of Industrial Relations. The mining company had posted a bond of $2,500 per disturbed acre at the mining site and had agreed to the re-vegetation of all areas not covered by water.
Speaks acknowledged that, immediately before the trial of this case, ADEM had cited the mining company for a permit violation. He explained that one of the sedimentation ponds had not been large enough to prevent some sediment from escaping into a tributary of Weoka Creek, and, he said, the mining company had begun to address that problem even before ADEM issued the citation. When Speaks was asked whether the citation indicated that the local residents’ concerns about water pollution in this case were valid, counsel for the mining company objected and stated that the company had just received the citation, that it had seven days to respond to ADEM, and that Speaks was preparing the response. The circuit court sustained the objection on the ground that the question called for speculation on the part of the witness.
Speaks testified that ADEM regulations for the mining site would allow less sediment to wash off the site than the sediment that would typically wash off the property if it were used for farming, logging, or residential construction. He gave *169 his opinion that a granite-mining operation could be conducted on the site without causing undue harm to the surrounding environment or the local residents if the operation were conducted in accordance with the terms of the permit.
Speaks acknowledged that neither he nor ADEM had addressed any road-structure issues in the permit-application-and-issuance process. He said the condition of Providence Road ranged from “decent” to “pretty bad.” He described Jackson Trace Road as “awful” and said, “You can’t get a truck down through there.” The following occurred on cross-examination:
“Q. [By counsel for the mining company]: You design roads. Are you familiar with roads of this type and quality?
“A. Yes, sir.
“Q. Do you have a judgment and opinion if you put 120 tri-axle trucks, some weighing empty 30,000 pounds, some weighing full 88,000 pounds, how long Providence Road would last?
“A. About the same thing [the] county engineer told you yesterday, even though I would probably say it would be a little bit less that what they said.
“Q. Are you familiar with Jackson Trace Road?
“A. Yes, sir.
“Q. Would you have the same answer there?
“A. It is already torn up.
“Q.[W]hat is your judgment and opinion as to how long those roads would last?
“A. You can’t tell. You can’t tell truthfully. They may last a day. They may last a month. They are not going to last long.”
On June 5, 2007, the circuit court entered the following judgment in case number CV-03-253, the local residents’ action alleging that the mining operation was both a public and a private nuisance:
“This cause coming on before this court upon the consolidated trial on the merits for declaratory relief and injunc-tive relief, on December 14 and 15, 2006, and the parties appearing through counsel of record, the court received testimony at length, ore tenus and the court additionally making a road inspection of the subject area of the quarry site as well as the area of the residences of the parties, and the two identified Elmore County roads and upon hearing the testimony, the court hereby finds as follows:
“1. This court specifically does not find that the operation of the subject quarry is a public nuisance nor is the same found to be a private nuisance under § 6-5-120 et seq., Code of Alabama, 1975.
“2. This court specifically denies the relief of an injunction for the operation of the subject quarry and finds that the same further does not fall within the definition of a public or private nuisance under § 6-5-120, et seq., Code of Alabama 1975.”[5]
On July 11, 2007, the local residents appealed to the Alabama Supreme Court. *170 The supreme court transferred the appeal to this court pursuant to § 12-2-7(6), Ala. Code 1975.

Standard of Review

In Southwestern Construction Co. v. Liberto, 385 So.2d 633 (Ala.1980), the Alabama Supreme Court set out the applicable standard of review of a trial court’s judgment in an action to abate a nuisance:
“A determination made by the trial court, when evidence is taken ore tenus, is favored with a presumption of correctness and will not be disturbed on appeal unless plainly erroneous or manifestly unjust, especially where, as was done in this case, the trial judge has made a personal inspection of the premises.”
385 So.2d at 635. See also Baldwin v. McClendon, 292 Ala. 43, 49, 288 So.2d 761, 766 (1974). Our supreme court has noted in at least one nuisance case that the ore tenus rule is subject to the same exceptions that are applicable in other types of cases. See Borland v. Sanders Lead Co., 369 So.2d 523, 526 (Ala.1979) (noting that the ore tenus standard of review does not apply when a trial court erroneously applies the law to the facts). Thus, the ore tenus standard of review, which is usually applicable in nuisance cases, is not “ ‘applicable where the evidence is undisputed, or where the material facts are established by the undisputed evidence.’ ” Barber v. Jefferson County Racing Ass’n, Inc., 960 So.2d 599, 603 (Ala.2006) (quoting Salter v. Hamiter, 887 So.2d 230, 234 (Ala.2004)).
The circuit court’s June 5, 2007, judgment does not contain specific findings of fact. “ ‘It is ... well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.’ ” Ex parte Fann, 810 So.2d 631, 633 (Ala.2001) (quoting Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996)).

Discussion

The following statutory provisions guide our analysis:
“A ‘nuisance’ is anything that works hurt, inconvenience or damage to another. The fact that the act done may otherwise be lawful does not keep it from being a nuisance. The inconvenience complained of must not be fanciful or such as would affect only one of a fastidious taste, but it should be such as would affect an ordinary reasonable man.”
§ 6-5-120, Ala.Code 1975.
“Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals. Generally, a public nuisance gives no right of action to any individual, but must be abated by a process instituted in the name of the state. A private nuisance gives a right of action to the person injured.”
§ 6-5-121, Ala.Code 1975.
“If a public nuisance causes a special damage to an individual in which the public does not participate, such special damage gives a right of action.”
§ 6-5-123, Ala. Code 1975.
“A private nuisance may injure either the person or property, or both, and in either case a right of action accrues.”
§ 6-5-124, Ala.Code 1975.
“Where the consequences of a nuisance about to be erected or commenced will be irreparable in damages and such consequences are not merely possible but to a reasonable degree certain, a *171 court may interfere to arrest a nuisance before it is completed.”
§ 6-5-125, Ala.Code 1975.
The burden of proof cast upon one seeking to enjoin a proposed enterprise as an anticipated nuisance is higher than the burden of proof cast upon one seeking to enjoin an existing enterprise as a nuisance. See McCord v. Green, 555 So.2d 743 (Ala.1989), overruled on other grounds by Parker v. Ashford, 661 So.2d 213 (Ala.1995). In McCord, the Alabama Supreme Court stated:
“[T]he injunction of anticipated nuisances ... [is an] extraordinary power[ ] that must be cautiously and sparingly exercised. Because of the great degree of caution that must be utilized, this Court has been exceedingly unwilling to enjoin a proposed enterprise until it has been proven at trial to be a nuisance.
“Although § 6-5-125 authorizes the injunction of anticipated nuisances, such injunctions should be denied unless the plaintiff shows to a reasonable degree of certainty that the anticipated act or structure will, in fact, constitute a nuisance.
“ ‘ “It is a general rule that an injunction will be denied in advance of the creation of an alleged nuisance, when the act complained of may or may not become a nuisance, according to the circumstances, or when the injury apprehended is doubtful, contingent or merely problematical. And so where an injunction is sought merely on the ground that a lawful erection will be put to a use that will' constitute a nuisance, the court will ordinarily refuse to restrain the construction or completion of the erection, leaving the complainant free, however, to assert his rights thereafter in an appropriate manner if the contemplated use results in a nuisance.” ’ ”
555 So.2d at 745 (quoting Parker v. City of Mountain Brook, 286 Ala. 241, 246, 238 So.2d 868, 873 (1970), quoting in turn Brammer v. Housing Auth. of Birmingham Dist., 239 Ala. 280, 283-84, 195 So. 256, 259 (1940)) (citations omitted).
The local residents argue that the circuit court’s conclusion that the proposed quarry did not constitute a public or private nuisance was plainly erroneous. They maintain that they met their burden of proving “to a reasonable degree of certainty” that the proposed mining operation would have consequences — noise, diminution of property values, air and water pollution, and increased traffic with attendant road deterioration and driving hazards— that, they say, would be irreparable and could not be compensated by money damages. We will address those arguments in the order presented.

Noise

Citing Parker v. Ashford, 661 So.2d 213 (Ala.1995), and Morgan County Concrete Co. v. Tanner, 374 So.2d 1344 (Ala.1979), the local residents assert that the blasting and rock-crushing processes of the mining operation, as well the number of loud trucks traveling to and from the quarry every day, will unreasonably interfere with the peace and quietude of their community and hinder the enjoyment of their property so as to constitute a nuisance. Parker dealt with an injunction against an alleged anticipated nuisance, whereas Morgan Concrete dealt with an injunction against an alleged existing nuisance.
In Parker, the Alabama Supreme Court affirmed a trial court’s determination that the defendant’s proposed operation of a dirt-racing track in a rural area would be a nuisance because, among other things, the noise levels of the unmuffled cars on the track would be excessive and would pose a *172 health hazard for residents adjacent to the track. The Parker plaintiffs presented the expert testimony of an audiologist who had analyzed the noise at an existing dirt-racing track nearby and had concluded that the elevated decibel levels there could cause hearing loss as well as changes in blood pressure and heart rate. The court held that the plaintiffs had “demonstrated that it is not reasonably possible for the proposed racetrack to be constructed and operated in a manner that would not create a nuisance.” 661 So.2d at 218 (emphasis added).
In Morgan Concrete, 98 residential homeowners sought to have an ordinance rezoning an area from “light industrial” to “general industrial” declared void and to enjoin the operation of a ready-mix concrete plant on the rezoned property. By the time of trial, the plant had been operating for several months, and the plaintiffs produced the following evidence:
“[Witnesses ... testified that the plant produced loud and bothersome noises sounding like ‘jackhammers’ and ‘large rocks beating against tin.’ They stated these noises would commence early in the morning and were loud enough to be heard indoors. Some witnesses also testified that they were bothered by noises from frontend loaders and cement trucks entering the plant for their loads which often entailed banging the tailgates to dislodge sand residues.”
374 So.2d at 1345. The supreme court affirmed the trial court’s judgment declaring the ordinance void and determining that the plant was a nuisance on the basis of, among other things, noise.
Although our supreme court determined, in both Parker and Morgan Concrete, that the parties seeking an injunction had satisfied their burdens of proof, it is significant that the plaintiffs’ burden in Parker was higher than the plaintiffs’ burden in Morgan Concrete. The local residents in this case had the same burden as the plaintiffs in Parker, who were seeking to enjoin an anticipated nuisance. Unlike the plaintiffs in Parker, however, the local residents in the present ease presented no evidence indicating exactly what injuries they were reasonably certain to suffer as a consequence of the noise that, they anticipated, would occur from the blasting or rock-crushing operations at the mining site. Compare Parker, supra (holding that elevated decibel levels at dirt racetrack could cause hearing loss as well as changes in blood pressure and heart rate) with Connecticut Bank & Trust Co. v. Mularcik, 22 Conn.Supp. 415, 419, 174 A.2d 128, 131 (Super.Ct.1961) (noting, in a suit to enjoin the owners of a sand and gravel bank from operating a rock crusher and a stone screener, that “[plaintiffs merely allege that they will be ‘necessarily’ subjected to unreasonable noise, without alleging, let alone proving, any facts to indicate that they would be disturbed”). Accordingly, we cannot hold that the circuit court’s implicit factual finding that the mining operation was not a nuisance by reason of the noise incident to blasting or rock-crushing operations was plainly erroneous.
The local residents did, however, present evidence with respect to the noise that, they anticipated, would be caused by the trucks traveling to and from the quarry every day. The local residents’ proof indicated that the trucks, which were equipped with “jake brakes” that sounded “like a machine gun,” were likely to awaken the nearby residents in the early morning hours as they lined up outside the quarry site to take on their first loads of the day. See Benton v. Kernan, 127 N.J.Eq. 434, 469, 13 A.2d 825, 843 (N.J.Super.Ct. Ch.Div.1940) (noting that at the defendant’s stone quarry the “parade of trucks begin[s] at or before 7 A.M. ... *173 [and] that from about 7 A.M. to 4:30 P.M. approximately 200 trucks went in and out of the quarry. Most of them were heavy-duty trucks”), modified in part and affirmed, 130 N.J.Eq. 193, 21 A.2d 755 (1941). In addition, the local residents presented evidence indicating that the sheer volume of heavy-truck traffic on the roads—one truck every five minutes— would be disruptive to the calm and quietude of the area.
 “Whether or not noise in itself, constitutes a nuisance is a question of fact dependent on the nature and character of the noise, its constancy or frequency, and the extent of the inconvenience caused by it.” Connecticut Bank & Trust Co. v. Mularcik, 22 Conn.Supp. at 419, 174 A.2d at 131; Krueger v. Mitchell, 106 Wis.2d 450, 317 N.W.2d 155 (Ct.App.1982), affirmed, 112 Wis.2d 88, 332 N.W.2d 733 (1983). See generally J.H. Crabb, Annotation, Quarries, Gravel Pits, and the Like as Nuisances, 47 A.L.R.2d 490 (1956).
“ “What may be a nuisance in one locality may not in another. Noises may be a nuisance in the country which would not be in a populous city. A person who resides in the center of a large city must not expect to be surrounded by the stillness which prevails in a rural district. He must necessarily bear some of the noise and occasionally feel slight vibrations produced by the movement and labor of its people and by the hum of its mechanical industries.’ ”
Morgan Concrete, 374 So.2d at 1346 (quoting Alabama Power Co. v. Stringfellow, 228 Ala. 422, 425, 153 So. 629, 632 (1934)).
Although the local residents presented evidence supporting their noisy-truck nuisance theory, the circuit court determined this factual question in favor of the mining company. Because the circuit court made a visual inspection “of the area of the residence of the parties” in relation to the roads, it could have concluded that the local residents’ homes were set back far enough from the roads that the noise level of vehicles on the roads would not constitute a nuisance. Based on our standard of review, see Southwestern Construction Co. v. Liberto, 385 So.2d at 635, we cannot hold that the circuit court’s implicit factual finding on this issue was plainly erroneous or manifestly unjust.

Diminution of Property Values

Both Reuben Hall and Winifred Harris testified that, in their estimation, the value of their real property would diminish if the mining operation were allowed to proceed. However, “[i]t is settled ... that the mere fact of diminution in value of complainants’ property ..., without more, is unavailing as a ground [to enjoin a private nuisance].” Nevins v. McGavock, 214 Ala. 93, 94, 106 So. 597, 598 (1925). Moreover, an injunction will not issue against a nuisance when the injury that may result from the nuisance is not irreparable and may be compensated by money damages. See Rosser v. Randolph, 7 Port. 238 (Ala.1838).

Air Pollution and Water Pollution

The mining company’s engineering expert testified in some detail about the steps taken by the company to comply with state and federal air-quality and water-quality regulations in order to receive a permit from ADEM. The expert also testified that ADEM has the authority to inspect the site at any time and that the mining company would be required to address any permit violation immediately. Accordingly, in view of the highly regulated nature of the mining industry, the circuit court was authorized to find that the local residents’ fears concerning air and water pollution were “doubtful, contingent or merely problematical,” see McCord v. *174 Green, 555 So.2d at 745, and to conclude that they had not proved the injuries they alleged with a reasonable degree of certainty, see § 6-5-125. Cf. Johnson v. Bryant, 350 So.2d 433, 435 (Ala.1977) (in an opinion reversing an order enjoining a beachfront property owner from extending her pier and adding a boathouse on the ground that the construction would create a nuisance, the supreme court noted that the property owner had obtained a permit from the Corps of Engineers to construct the addition); Shell Oil Co. v. Edwards, 263 Ala. 4, 8, 81 So.2d 535, 538 (1955)(reversing a judgment enjoining the construction of a filling station in a residential subdivision and noting that the construction had been “approved by the chief building inspector, chief of the fire department, the city engineer and the traffic officer of the police department”).

Suitability and Safety of the Roads

The local residents argue that the circuit court ignored the danger that would be caused to them and the driving public generally by the increased heavy-truck traffic on Providence Road, Jackson Trace Road, and Buyck Road. Increased traffic alone cannot be regarded as a substantial invasion of a property owner’s rights to the enjoyment of his property, see Fugazzoto v. Brookwood One, 295 Ala. 169, 325 So.2d 161 (1976) (holding that property owners’ allegation that proposed construction of private access road would increase traffic on public road abutting their property was an insufficient basis for granting an injunction to abate the alleged nuisance).
The local residents contend, however, that they established that the quarry would cause more than just a mere increase in the amount of traffic. Instead, they say, the evidence indicated that there would be a fundamental alteration in the quantity and quality of the traffic on the three roads—that once the quarry opened for business, Providence Road, Jackson Trace Road, and Buyck Road would change from little-used byways in a rural residential area to the routes of necessity for 120 overweight trucks per day—one every 5 minutes—with each truck weighing 15 tons unloaded and 44 tons loaded. The local residents point out that the evidence, which was unrefuted by the mining company’s two witnesses, indicated (1) that the roads are unable to handle such traffic safely; (2) that the road surfaces will certainly and quickly deteriorate; and (3) that the motoring public will be endangered.
In opposition to the local residents’ arguments regarding the allegedly unsafe condition and inevitable deterioration of the county roads, the mining company made four arguments at trial: (1) that it had no control over the trucks because they would be operated by independent haulers; (2) that maintaining the roads in a reasonably safe condition is the duty of the county; (3) that, notwithstanding its first two arguments, it had, nevertheless, offered not only to provide free materials for upgrading Providence Road but also to pay a portion of the cost of the upgrades; and (4) that the local residents, who had opposed an industrial-access grant to upgrade Providence Road, were barred by the unclean-hands doctrine from arguing that the condition of the roads was a basis for finding the mining operation a nuisance.
In its appellate brief, the mining company relies primarily on its second argument—that maintaining the roads in a reasonably safe condition is the duty of the county—pointing out that the evidence indicated that it was feasible to reclaim and rebuild Providence Road so that it would be able to withstand heavy-truck traffic. It is true that “[a] county has the duty to *175 keep its roads in a reasonably safe condition for travel and to remedy defects in the roadway on receipt of notice of those defects.” Macon County Comm’n v. Sanders, 555 So.2d 1054, 1057 (Ala.1990). See § 23-1-80, Ala.Code 1975, which provides, in pertinent part:
“The county commissions of the several counties of this state have general superintendence of the public roads ... within their respective counties so as to render travel over the same as safe and convenient as practicable. To this end, they have legislative and executive powers, except as limited in this chapter. They may establish, promulgate, and enforce rules and regulations, make and enter into such contracts as my be necessary or as may be deemed necessary or advisable by such commissions to build, construct, make, improve and maintain a good system of public roads ... in their respective counties, and regulate the use thereof ....”
The evidence was undisputed that the operation of the quarry will necessarily require the continuous use of heavy trucks on Providence Road, Jackson Trace Road, and/or Buyck Road that will certainly endanger the motoring public and damage the roads. The mining company presented no evidence to contradict Hall’s description of the dimensions and weight of the vehicles that will be used to haul the quarry’s product from the site or the frequency with which they will use the roads leading to and from the site. The mining company actually agreed with the evidence presented by the local residents that the trucks will impede traffic and cause severe damage to, and deterioration of, the roads in question.
Section 32-9-20, Ala.Code 1975, governs the width, length, height, and weight of vehicles traveling Alabama highways. Subsection (1) of § 32-9-20(1), about which one of the witnesses was questioned at trial, expressly states:
“[V]ehicles and combinations of vehicles, operating on highways with traffic lanes less than 12 feet in width, shall not exceed a total outside width, including any load thereon, of 96 inches, exclusive of mirrors or other safety devices approved by the State Transportation Department.”
Obviously, this section was enacted to protect against injuries on the public roads. See Heathcock v. State, 415 So.2d 1198 (Ala.Crim.App.1982). The legislature evidently recognized, as a matter of law, that vehicles wider than 8 feet traveling on roads with traffic lanes less than 12 feet wide present an unreasonable hazard.
Similarly, subsection (4) of § 32-9-20 establishes maximum weight formulas for various spacings of axle groupings, and subsection (4)h. specifically authorizes county commissions to post stricter weight limits on county roadways as one of their powers under § 23-1-80. See Ala. Atty. Gen. Op. No. 2004-021. The Elmore County Commission posted a weight limit of 25 tons on Providence Road, a road that will have to be used regardless of the route chosen to reach the quarry. The purpose in establishing weight limitations is to ensure the safety of the public and to keep the roads in good condition for the traveling public. See State Dep’t of Pub. Safety v. Scotch Lumber Co., 293 Ala. 330, 302 So.2d 844 (1974). As the following cases illustrate, a business whose operation requires the use of heavy vehicles that damage the roadways and render them unsafe is a nuisance.
In McCarter v. Ludlum Steel & Spring Co., 71 N.J.Eq. 330, 346, 63 A. 761, 767 (N.J.Sup.Ct. Ch. Div.1906), the court concluded that a locomotive used by a steel company to haul coal to and from its business could not be accommodated by a road *176 that was not intended for heavy travel so it enjoined the business from using that road without the municipality’s consent on the ground that the use was a nuisance. In Hancock v. Terry Elkhorn Mining Co., 503 S.W.2d 710 (Ky.1973), the court concluded that a coal-mining company’s overloading its trucks before placing them on public roads, thereby causing damage to the roads, which had not been designed for such heavy use, constituted a nuisance.
In Duff v. Morgantown Energy Associates, 187 W.Va. 712, 421 S.E.2d 253 (1992), the court overturned a judgment enjoining a cogeneration power facility from instituting its plan to operate heavy trucks 67 times a day to haul coal, gob, limestone, and ash into and out of its plant along the public roads of Morgantown, West Virginia. The court held that the plaintiffs in that case did not carry their heavy burden of proving an anticipated nuisance as defined by West Virginia law. 187 W.Va. at 721, 421 S.E.2d at 262. Based on its review of competing expert testimony, the court concluded that the Duff plaintiffs did not prove that the use of the trucks would necessarily cause damage so that “ ‘the fact that it will be a nuisance if so used [is] made clearly to appear, beyond all ground of fair questioning.’ ” 187 W.Va. at 717, 421 S.E.2d at 258 (citing Chambers v. Cramer, 49 W.Va. 395, 38 S.E. 691 (1901)); nor did the Duff plaintiffs prove that the danger from the trucks posed “impending and imminent” danger of “serious” harm. Id.
Unlike the plaintiffs in Duff, the local residents in this case proved without contradiction that the intended heavy-truck use violated applicable weight and width limitations; that the use of the trucks would necessarily damage the roads; that this damage would be severe and fairly immediate; and that the damage would unduly increase the risk of accidents and injuries to the motoring public. These undisputed facts establish all the elements of an anticipatory nuisance under Alabama law. See Parker v. Ashford, supra.
Alabama law defines a “nuisance” as “anything that works hurt, inconvenience or damage to another.” § 6-5-120. Although no Alabama case has so held, it seems obvious that if, in its usual operation, a business routinely places oversized vehicles on a narrow road that impedes passing traffic and unduly increases the risk of accidents in violation of § 32-9-20(1), the business should be considered a nuisance.
In Commonwealth v. Allen, 148 Pa. 358, 23 A. 1115 (1892), a stone quarry operated along a narrow public road three miles from a railroad station. The quarry began using a steam engine to carry its product from the mine to the station along the road. That engine, along with its load, made a train 50 to 55 feet long weighing 13 to 14 tons. The engine took an hour to an hour and a half to make the trip. During that time, it hindered and obstructed travel on the road such that other travelers had to leave the road to allow the train to pass or had to use a different route miles away. In finding that this abuse of the public highways amounted to a nuisance, the court said: “At common law, any obstruction which unnecessarily incommodes or impedes the lawful use of a highway by the public is a nuisance.” 148 Pa. at 363, 23 A. at 1116. Although the court recognized that the quarry had a right to reasonable use of the public highways, the court observed, “[i]t is quite another matter to occupy a particular road continuously, for such purpose, to the inconvenience of the public, and peril to persons using such road.” 148 Pa. at 364, 23 A. at 1116. As Allen illustrates, the continuous use of a public road in such a manner as to deprive the traveling public of their full *177 and intended use of the road amounts to a nuisance. Cf. People v. Linde, 341 Ill. 269, 275, 173 N.E. 361, 363 (1930) (taking judicial notice of the fact that “the use of public roads ... by vehicles of excessive weight is calculated to result, not only in injury to [the roads], but also in danger to all who travel such thoroughfares”); Hancock v. Terry Elkhorn Mining Co., 503 S.W.2d at 719 (affirming the issuance of an injunction requiring a mining company to maintain highways that had been destroyed by overweight coal trucks that “constituted an extremely serious hazard to the traveling public in its attempt to use the damaged roads”); State ex rel. Brookside Poultry Farms, Inc. v. Jefferson County Bd. of Adjustment, 125 Wis.2d 387, 398, 373 N.W.2d 450, 455 (1985)(in refusing to substitute its judgment for that of a county board of zoning adjustment, the court noted that the board had “heard extensive testimony on the truck and equipment traffic that would be generated by a [poultry] operation — as many as fifty-nine trips per day would be made by tractors, trucks and manure spreaders over narrow, hilly, curving, shoulderless roads — and concluded that such traffic could create a health and safety hazard in the area”).
In determining whether to enjoin an anticipatory nuisance, a court may. not “ ‘ “ignore the ... inevitable consequences to follow upon the conduct of the business which [the] defendant proposes to carry on, however well conducted.” ’ ” Parker v. Ashford, 661 So.2d at 218 (quoting Jackson v. Downey, 252 Ala. 649, 652, 42 So.2d 246, 248 (1949), quoting in turn Bloch v. McCown, 219 Ala. 656, 658, 123 So. 213, 215 (1929))(emphasis added). If, as the evidence in this case established, the roads will be defective and dangerous once the mining company begins operations, then the mining company’s business is a nuisance — irrespective of the fact that the mining company has no responsibility for the trucks that will be owned and operated by independent contractors and irrespective of the fact that maintaining the roads is the county commission’s responsibility— because the heavy-truck traffic is an inevitable consequence of the mining company’s business. Given the undisputed evidence that Providence Road, Jackson Trace Road, and Buyck Road will be unsafe for the motoring public when the trucks that are a necessary incident of the mining operation begin to travel those roads, it is clear that the local residents proved to a reasonable degree of certainty that the mining operation is a public nuisance.
The determination that the mining operation is a public nuisance, however, does not end the inquiry in this case. Two additional questions are presented as a consequence of the fact that the circuit court entered no judgment in case number CV-05-254—the state’s public-nuisance action—and that the state is not a party to this appeal. First, it must be determined whether the local residents established that they had a right of action, pursuant to § 6-5-123, to abate a public nuisance and, second, if so, it must be determined whether their opposition to the grant application intended to improve Providence Road implicated the unclean-hands doctrine and thereby estopped the local residents from claiming that the condition of the roads was a basis for determining the mining operation to be a nuisance.

Section 6-5-123

Section 6-5-121 states the general rule that “a public nuisance gives no right of action to any individual, but must be abated by a process instituted in the name of the state.” Section 6-5-123 states the exception to that general rule: “If a public *178 nuisance causes a special damage to an individual in which the public does not participate, such special damage gives a right of action.” In Strickland v. Lambert, 268 Ala. 580, 582, 109 So.2d 664, 665 (1959), our supreme court explained that “‘[a]n individual complaining of a public nuisance must show some special injury to himself different from the common injury to the public.’ ” (Quoting Scruggs v. Beason, 246 Ala. 405, 407, 20 So.2d 774, 775 (1945).) The injury must be different in kind, as well as degree, from the injury suffered by the public at large. See, e.g., Horton v. Southern Ry. Co., 173 Ala. 231, 248, 55 So. 531, 535 (1911). However, “[t]he law does not require that before a party can abate a nuisance he must show an injury which is unique to him.” Strickland v. Lambert, 268 Ala. at 584, 109 So.2d at 667.
Of all the Alabama “special injury” cases, Barnes v. Kent, 292 Ala. 508, 296 So.2d 881 (1974), Scruggs v. Beason, 246 Ala. 405, 20 So.2d 774 (1945), and Sloss-Sheffield Steel & Iron Co. v. Johnson, 147 Ala. 384, 41 So. 907 (1906), are the most nearly analogous to the facts of the instant case because those decisions address the question whether individual plaintiffs established “special injury” as a consequence of the public nuisance created by a defendant’s obstruction of a public road. Although the present case does not deal with the obstruction of a public road, the effect on the traveling public is the same when a business continuously operates oversized vehicles on the road as when a business erects a permanent obstruction on the ' road. In both cases, travelers using the road can expect to encounter an impediment to travel and the associated inconvenience and interference with their lawful use of the road. The fact that the impediment is moving only makes it more of a nuisance because the traveler cannot predict at what point on the road he will encounter the impediment.
In Barnes v. Kent, the court held that, although Barnes’s obstruction of a public road interfered with the rights of all members of the public who wished to travel on that road, it specially interfered with Kent’s rights because, to reach his property from the south, Kent had to travel two or three extra miles to avoid the obstruction. The court determined that Kent’s special injury was not mitigated by the fact that he had unobstructed access to his property from the north.
In Scruggs v. Beason, the court held that the defendant’s obstruction of a public road caused the individual plaintiffs a special injury different from the common injury to the public because the road was the only entrance to a cemetery where the plaintiffs’ family members were buried. The court stated:
“A cemetery is a place not only for the burial of the dead, but for an expression of love and respect by the living for the dead. Hence there must be accorded to complainants not only the right of burial but also the right to visit, maintain and beautify the graves of relatives interred therein, without obstruction in the public road.”
Scruggs, 246 Ala. at 408, 20 So.2d at 775. In Sloss-Sheffield, the court held that the owner of property abutting a public road who was compelled to take a circuitous route to his property because of the dumping of slag in the road had established special damage from a public nuisance.
Reading Barnes v. Kent, Scruggs v. Beason, and Sloss-Sheffield together, we discern the following principles: An individual who cannot reach his home (or any other destination, such as a family cemetery, that holds a significance that society is prepared to recognize as compel *179 ling) without having to take a circuitous alternate route in order to avoid a public nuisance has established special injury different in kind as well as degree from the injury suffered by the public at large. A fortiori, an individual who cannot avoid a public nuisance by taking an alternate route to his home — because there is no alternate route — has established a special injury.
Applying those principles to the facts of the present case leads to the following conclusion: The local residents, who cannot travel to or from their homes without encountering the inherent danger of driving on Providence Road, Jackson Trace Road, and Buyck Road because those roads provide the only means of ingress and egress to their homes, established special injury different in kind as well as degree from the injury suffered by the public at large. Accordingly, they had a right of action, pursuant to § 6-5-123, to abate a public nuisance.

Unclean Hands

Nuisance is a legal — not an equitable—action. See generally Wootten v. Ivey, 877 So.2d 585 (Ala.2003) (explaining the propriety of submitting a nuisance claim to a jury and, depending on the jury’s verdict, reserving to the trial court the decision on equitable relief). Injunction is an equitable remedy, see Nunley v. State, 628 So.2d 619 (Ala.1993), that is subject to equitable defenses such as the unclean-hands doctrine. See Ex parte HealthSouth Corp., 978 So.2d 745 (Ala. 2007). The unclean-hands doctrine is not a “defense” to a nuisance action; that is, it is not a basis for concluding that the mining operation is not a nuisance. Instead, the unclean-hands doctrine would have come into play only if the circuit court had declared the mining operation to be a nuisance and the court had then been required to decide the propriety of imposing an equitable remedy — issuing an injunction — to abate the nuisance. Because the circuit court decided that the mining operation was not a nuisance, it simply had no reason to consider the unclean-hands doctrine — or any other equitable principle such as the “comparative injury rule” or a “balancing of the equities.” See Southwestern Construction Co. v. Liberto, 385 So.2d at 636, in which our supreme court stated:
“Defendants contend the trial court erred in failing to apply the comparative injury rule to find there was not a nuisance. As is well known, the comparative injury rule employs a balancing test to weigh the injury that may accrue to one or to the other of the parties, and to the public, by granting or refusing the injunction. Pritchett v. Wade, 261 Ala. 156, 73 So.2d 533 (1954). Defendants contend the service they are providing to the public at large ... and the detriment to them from enjoining their activity outweigh any detriment to plaintiffs.
“However, plaintiffs correctly rebut this argument by pointing out that the comparative injury rule does not arise until after there has been a finding that a nuisance exists. Once the trier of fact determines that a nuisance does indeed exist, a balancing test must be employed to determine whether injunction is a proper remedy. The comparative injury rule is not employed, as defendants suggest, to determine whether a nuisance does, in fact, exist.”
(Emphasis on “not” original; other emphasis added.)
The unclean-hands doctrine does not bar injunctive relief in this case. The doctrine contemplates that the party against whom it is asserted has been guilty of “morally reprehensible, willful misconduct,” Retail Developers of Alabama, LLC *180 v. East Gadsden Golf Club, 985 So.2d 924, 932 (Ala.2007), or fraudulent purpose, see Le Furgey v. Beck, 244 Ala. 281, 284, 13 So.2d 179, 182 (1943). The local residents who opposed the county’s application for a road-improvement grant were acting within their constitutional rights as citizens to petition their. local government about a matter of interest to them, see U.S. Const. Amend I; Ala. Const.1901, Art. I, § 26; their conduct cannot be considered wrongful, morally reprehensible, or fraudulent. “[T]he doctrine of unclean hands requires something more egregious than mere litigation strategy” or “procedural maneuvering.” Medtronic, Inc. v. Advanced Bionics Corp., 630 N.W.2d 438, 450 (Minn.Ct.App.2001).
Moreover, the local residents’ actions before the county commission were only indirectly connected with the nuisance suit they later filed. Our supreme court has stated that “ ‘[t]he misconduct which falls within the clean hands maxim must relate directly to the transaction concerning which complaint is made or the subject matter in litigation.’” Powell v. Mobile Cab & Baggage Co., 263 Ala. 476, 480, 83 So.2d 191, 194 (1955) (quoting 30 C.J.S. Equity § 98 at 491-92) (holding that a taxicab company was not guilty of unclean hands by its failure to have obtained a business license in the city where, it alleged, a rival taxicab company had subjected it to unfair business competition). In Powell, the court explained:
“ ‘The misconduct which falls within [the unclean-hands] maxim must have infected the cause of action, so that to entertain it would be violative of conscience. It is not sufficient that the wrongdoing is remotely or indirectly connected with the matter in controversy.’ ”

Id.

Finally, not all the local residents opposed the road-improvement grant, and the acts of some of them are not chargeable against the others. See Deitrick v. Leadbetter, 175 Va. 170, 174, 8 S.E.2d 276, 277 (1940) (holding that, in an action to enforce a “residential-use” restrictive covenant in a deed and to enjoin the defendant from using her residence as a tourist home, the fact that one plaintiff had unclean hands because she had also used her residence as a tourist home could not be charged against the other plaintiffs who had not violated the residential-use restriction).

Conclusion

The evidence at trial conclusively established that Providence Road, Jackson Trace Road, and Buyck Road will be unsafe for the motoring public when the heavy trucks that are a necessary incident of the mining operation begin to travel those roads. Accordingly, the mining operation is - a public nuisance by reason of the fact that one inevitable consequence of its operation will be defective and dangerous roads. The circuit court’s determination otherwise' is plainly erroneous and manifestly unjust. The local residents established that they had a right of action, pursuant to § 6-5-123, to abate the public nuisance because they proved a special injury to themselves different from the common injury to the public. Finally, the local residents who had earlier opposed the road-improvement grant before the county commission were not precluded by the unclean-hands doctrine from seeking to enjoin the mining operation on the ground that it would cause the roads to be defective and dangerous.
On remand, the circuit court has the inherent discretion to “balance the equities” in deciding how to abate the anticipated nuisance established by the local residents. See Patterson v. Robinson, 620 So.2d 609, 612 (Ala.1993) (stating that the *181 comparative-injury doctrine “serves to channel [a court’s] inherent discretion [in fashioning an equitable remedy] by requiring the court, if feasible under the circumstances, to place restrictions on a business rather that to completely enjoin its operation”).
The judgment of the Elmore Circuit Court is reversed, and the cause is remanded for further proceedings consistent with the principles outlined in this opinion.
REVERSED AND REMANDED.
THOMAS and MOORE, JJ., concur.
THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur in the result, without writings.

. The complaint was filed by Randall Houston, district attorney for the 19th Judicial Circuit of Alabama, acting as special deputy attorney general.

. In subsequent questioning, Hall's attorney referred to 100 to 120 trucks per day. It is evident that he was counting the 60 unloaded trucks entering the quarry and 60' loaded trucks leaving the quarry to reach that number.

. Hall testified that in his opinion the plan set out in the grant application would have been inadequate to support the quarry traffic.

. At the time of trial, Cardwell did not stop and pick up any children on the roads at issue, but she testified that the roads remain part of her route and that in the future she may have to make stops on the roads to load and unload passengers. At the time of trial, at least one other school bus did stop and pick up two children on Providence Road.

. The record does not indicate that the circuit court entered a judgment in case number CV-05-254, the state’s action alleging that the mining operation was a public nuisance. " ‘Where several actions are ordered to be consolidated for trial, each action retains its separate identity and thus requires the entry of a separate judgment.’ League v. McDonald, 355 So.2d 695, 697 (Ala.1978) (quoting Rule 42(a), Ala. R. Civ. P., and Committee Comments on 1973 Adoption, and Teague v. Motes, 57 Ala.App. 609, 330 So.2d 434 (1976)).” Alabama Classic Homes, Inc. v. Wickes Lumber Co., 836 So.2d 885, 887 (Ala.Civ.App.2002).